550 So.2d 183 (1989)
Chris MOLBERT, et al.
v.
Arthur TOEPFER, et al.
No. 89-C-0836.
Supreme Court of Louisiana.
October 23, 1989.
Norman L. Sisson, William W. Irwin, Jr., Edward A. Michel, Baton Rouge, Robert J. Adams, Lafayette, and Sharon Lyles, Baton Rouge, for applicants.
Nora Stelly, Allen & Gooch, E. Gregory Voorhies, Voorhies & Labbe', Lafayette, Paul J. Hebert, Sonnier, Hebert & Hebert, *184 Abbeville, and John Blackwell, Gibbens & Blackwell, New Iberia, for respondents.
CALOGERO, Justice.
A guest passenger in a one car accident satisfied the district court and the court of appeal that he was not at fault and that both his host driver and the Department of Transportation and Development were. Applying comparative fault principles, the district court assessed the Department 5% fault and the host driver 95%. Substantial monetary damages were then awarded without any reduction responsive to plaintiff's fault.
We granted a writ of review in order to examine the contentions that the Department was not at fault, and that, in all events, any fault of the Department was not a cause of the accident. Finding no merit in relator's assigned errors, including those regarding alleged excessive damages, and those regarding the district court's exoneration of the City of Lafayette, we affirm the judgments of the district court and the court of appeal.
With plaintiff Chris G. Molbert in the front passenger seat, the owner/driver, Arthur Toepfer, drove away from Sugar's Lounge, a bar and college hangout in Lafayette near the University of Southwestern Louisiana campus at about 2:00 a.m. on March 2, 1984. More than a mile away, while traveling north on the Evangeline Thruway, the vehicle failed to negotiate a curve at the intersection of Simcoe Street. The car scraped a wooden utility pole just across the intersection near the westernmost edge of the three northbound lanes, then struck head-on a metal traffic pole several feet beyond the wooden utility pole (just a few feet from the curb). The metal pole collapsed atop Toepfer's 1972 Triumph convertible, extensively damaging the vehicle and injuring both occupants, Molbert the more seriously. There were no eye witnesses to the accident, and both young men have since been unable to recall the events immediately surrounding the accident.
In determining whether liability exists under the facts of a given case, we analyze the situation using a duty-risk formula, in which we consider these questions:
(1) Was the affirmative conduct a cause-in-fact of the resulting harm?
(2) Was there a duty to protect this plaintiff from this type of harm arising in this manner?
(3) Was that duty breached?
Mart v. Hill, 505 So.2d 1120 (La.1987); Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); W. Crowe, The Anatomy of a Tort, 22 Loy.L.Rev. 903 (1976).
The 95% fault assessment against Toepfer was responsive to the following evidence: 1) he was the driver; 2) his blood alcohol level two hours after the accident tested at .13% by weight; 3) his vehicle failed to negotiate the curve; and 4) his vehicle was seen recklessly running, or "walking," a stop sign and three red lights just shortly before the accident.
No one quarrels with the determination that Toepfer was negligent or that his negligence was a substantial cause of the accident. As a driver, Toepfer had a duty, which he breached, to use reasonable care in the operation and control of his vehicle. Smith v. Travelers Ins. Co., 430 So.2d 55 (La.1983). This duty encompassed within its scope the risk that guest passengers might be injured in a collision. Therefore, Toepfer is liable for Molbert's injuries.
The 5% fault assessment against the Department was responsive to the following evidence: 1) the speed limit for the "S" curve was set by the Department and signed for 35 miles per hour although the design speed for the curve was 27 miles per hour; 2) though not apparent to the driver, the second portion of the "S" curve was essentially two differing but successive curves, the first part a more gradual 10 degrees, the second a sharper 19 degrees; 3) this change in curvature caused the overall curve to end in a "hook" rather than a spiral[1]; 4) the "hook" required a driver at *185 any speed to reset his steering wheel after commencing the curve, to negotiate the curve safely; 5) the width of each of the three lanes was less than 11 feet although recommended design width was 12 feet; 6) although chevrons warned drivers about the "S" curve, no warning was given relative to the "hook" in the second phase of the "S" curve; and 7) a resident of property on the same northwest corner of the intersection where the accident occurred testified that on other occasions drivers had failed to negotiate the curve and had run into his yard, prompting him to put up a barrier.
In applying a duty-risk analysis to the Department's conduct, we conclude as did the trial court and court of appeal, that the design and signing of the curve were faulty, and although the driver Toepfer was significantly more blameworthy, the Department was concurrently at fault since its affirmative conduct was a substantial factor in bringing about the harm. Ledbetter v. State, Through Dept. of Transp. & Dev., 502 So.2d 1383 (La.1987); LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978).
The Department argues that the accident was caused by Toepfer's reckless driving, that Toepfer would have ignored a lesser speed limit and better curve warnings just as he ignored earlier traffic signals and a stop sign, and that irrespective of the faulty curve, the accident would have happened anyway. It requires noting at this point that there was no direct evidence of Toepfer's speed. The district court here could well have concluded, and we so conclude, that Toepfer was probably traveling at least 35 miles per hour, the posted speed limit, and possibly, if not probably, at a somewhat greater speed.
The defendant's witness, Dudley Darbonne, testified that he observed Toepfer's vehicle before it reached the Evangeline Thruway, "speeding" up the street, running red lights and a stop sign. The Toepfer and Darbonne vehicles apparently left Sugar's at about the same time. They crossed paths shortly thereafter at the intersection of Jefferson and Lamar, Toepfer traveling northeast on Lamar, and Darbonne traveling northwest on Jefferson. It was at the Jefferson-Lamar intersection where Darbonne says he first saw Toepfer run a red light, right in his path.
Though following different routes the two vehicles wound up on Johnston Street travelling northeast toward the Thruway. Where Johnston intersects with the southbound, and then the northbound lanes of the divided Thruway, Darbonne saw Toepfer run the pair of red lights. Darbonne was one to one and one half blocks behind Toepfer at that point. Toepfer turned left onto the Thruway enroute to the accident site at Thruway and Simcoe (a relatively short distance from Johnston and Thruway). The distance between Sugar's and the traffic signal lights at Johnston and Thruway was approximately one mile.
Darbonne testified that he was not speeding, and yet the Toepfer vehicle over a partially different one mile route did not significantly out-distance the Darbonne vehicle. The implication is that at least between the outset of the journey from Sugar's Lounge and the Johnston-Evangeline Thruway intersection, Toepfer's vehicle was not traveling much, if at all, in excess of the same speed limit which Darbonne testified he had respected.
Furthermore, although driving negligently, Toepfer was apparently in control of his car on this journey, at least before he reached the curve at the intersection of the Thruway and Simcoe. Darbonne testified that as he traversed the Lamar-Jefferson intersection, Toepfer ran the red light, maneuvered completely around Darbonne's automobile, and regained his original direction. Also, although Toepfer ran the lights on the Evangeline Thruway, he slowed before going through each intersection. Although Toepfer was ignoring some *186 traffic rules, he was not oblivious to them, and he exhibited adequate driving skills before arriving at Simcoe. We agree with the district court's determination that in spite of Toepfer's negligent driving, the accident would not likely have occurred but for the Department's failure to correctly design the curve, to warn of the curve's danger, and to post the appropriate speed advisory. The Department's conduct was a cause in fact of the accident.
Did the Department have a duty to protect Molbert from the type of harm which occurred and in the manner that it did? The Department did have a duty to design and construct a safe curve as well as a duty to sign the intersection properly; breach of those duties constitutes fault. Furthermore, the Department owes these duties not only to prudent and perhaps imprudent and inattentive drivers, but also to their passengers. Burge v. City of Hammond, 494 So.2d 539 (La.1986); Ledbetter v. State, 502 So.2d 1383, 1387 (La. 1987).
Did the Department breach that duty? Concerning the Department's fault, experts including the Department's traffic engineer, Olin Dart, testified that they would have designed the curve to end in a spiral so that the curve would end gradually, allowing vehicles to follow their natural path when negotiating and exiting the curve rather than in a hook in which the curve abruptly changed from 10 to 19 degrees without warning. They also testified that the design speed of the curve was 27 miles per hour, and that the "safe speed" of the curve for worst case conditions, measured by a ball bank indicator, was 26-27 miles per hour. The district court was correct in finding fault on the part of the Department.
An appropriate review of the judgments below requires that we also consider the courts' determination that Molbert did not assume the risk and was not contributorily negligent. Recently in Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La. 1988), this court determined that assumption of risk is no longer a viable legal concept in Louisiana tort law. We concluded that a plaintiff's conduct should be assessed on the basis of civilian concepts of comparative fault and duty-risk. Id. at 1132. Therefore, we assess the plaintiff's conduct within the general scheme of comparative negligence, assigning liability to the plaintiff in proportion to his fault. Id. at 1133-34. See also Bufkin v. Mid-American Indemnity Co., 528 So.2d 589 (La.App. 2d Cir.1988); Townley v. Manuel, 509 So.2d 515 (La.App. 3d Cir.1987); and Gravois v. Succession of Trauth, 498 So.2d 140 (La.1986), writ denied, 500 So.2d 422 (La.1987) (applying comparative negligence rather than assumption of risk when a guest passenger is injured while riding with an intoxicated driver).
In Prestenbach v. Sentry Insurance Company, 340 So.2d 1331, 1334 (La.1976), we summarized the law pertaining to a guest passenger injured while riding with an intoxicated driver:
The law is well settled that a guest passenger riding with a driver who has been drinking excessively assumes the risk of injuries received in an accident caused in whole or in part by the driver's negligence, if the alcohol-induced impairment of the driver's ability is a substantial contributory cause of the driver's negligence and if the guest passenger knows or should have known of the driver's condition and nevertheless voluntarily rides with him. Marcotte v. Travelers Ins. Co., 258 La. 989, 249 So.2d 105 (1971); Jones v. Continental Casualty Co., 246 La. 921, 169 So.2d 50 (1964).
Now, since the Legislature's revision of the contributory negligence statute and our decision in Murray v. Ramada Inns, "the fact that the plaintiff may have been aware of the risk created by the defendant's conduct should not operate as a total bar to recovery." Murray, 521 So.2d at 1134. Instead, the plaintiff's appreciation of the danger is among the factors to be considered in assessing percentages of fault. Id.
In the present case, the court found that the Department did not carry its burden of proving that Molbert was contributorily *187 negligent. The Department established that Molbert joined Toepfer at Toepfer's apartment at about 8:00 p.m. the evening before the accident. From the apartment the two men walked to Sugar's Lounge about a block away. Some time later in the evening the two may have been at Poets, an eating and drinking establishment some distance away from Sugar's.[2] At about 2:00 a.m., the two men were seen in Sugar's parking lot getting into Toepfer's car.
The investigating officer found a drink cup from Sugar's on the floor of Toepfer's car after the crash, and the emergency room nurse commented in her notes on the odor of alcohol on Toepfer's breath. However, defendants presented no evidence to establish that Toepfer's condition was noticeably impaired prior to embarking on their drive or that Molbert knew or should have known that Toepfer was intoxicated to a degree that his driving ability was likely impaired. Furthermore, the Department's expert testified that while Toepfer's blood alcohol level would suggest that his driving would be impaired, yet he would not have appeared "stuporous" or "falling all over himself." Therefore, the evidence is inconclusive that Molbert was aware or should have been aware that Toepfer had been drinking so much that his judgment or driving skills were likely impaired. While a passenger has a duty not to ride with a driver who he knows or ought to know has been drinking excessively, the Department failed to prove that Molbert breached this duty. Considering the facts and the law, we determine as did the district court, that defendant failed to prove Molbert contributorily negligent.
That proportionately the assignment of fault was 5% Department, 95% Toepfer merely suggests that comparing negligence and causative relationship, Toepfer was substantially more at fault and more the cause of this accident than the Department. However difficult these concepts and their application, i.e., determining degrees of fault and causative contribution, it is the job of the courts to make such assessment.
Contrary to the contentions made in this case by Toepfer that the percentages were assessed disproportionately as between him and the Department, we find no fault with the district court's 95-5 assessment. So too, as regards the Department, we find no error with the district court's assessing 5% of the fault to them.
There are two other issues in this case which did not prompt our granting the Department's writ. We find no error in the district court's quantum awards in favor of plaintiff and his parents or in the court's failure to find fault with the City of Lafayette. Regarding the liability of the City, the trial court determined, and the court of appeal affirmed, that the State owned, designed, and built the Evangeline Thruway. Although a maintenance agreement between the City and the State provided that the City would maintain signs and traffic signals on the Thruway, it was the State which had established the speed limit. Therefore, fault for the design and signing of the curve rested with the State and was not attributable to the City.

Decree
For the foregoing reasons, the judgments of the district court and the court of appeal are affirmed.
AFFIRMED.
DENNIS, J., concurs with reasons.
DIXON, C.J., and MARCUS and COLE, JJ., dissent and assign reasons.
COLE, Justice, respectfully dissenting.
In my view, the minimal design and signing fault was not a cause in fact of the accident.
*188 DENNIS, Justice, concurring.
I respectfully concur. The trial court's findings that the Department of Transportation and Development was at fault in causing the accident and that plaintiff was not negligent as a guest passenger, as well as its apportionment of fault were not manifestly erroneous or clearly wrong. See Rosell v. ESCO, 549 So.2d 840 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973).
Consequently, the Court of Appeal correctly refrained from disturbing the trial court's reasonable evaluations of credibility and inferences of fact upon review. See Rosell, supra; Arceneaux, supra; Canter, supra and authorities cited therein.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
It seems to me that the curve in the road did not cause the automobile to hit the poles. The car hit the poles because the driver failed to keep it in the road.
MARCUS, Justice (dissenting).
I consider that Toepfer's fault was the sole cause of the accident. I find no fault on the part of the Department but, even if it were at fault, the fault of the Department was not a cause of the accident. Accordingly, I respectfully dissent.
NOTES
[1] Civil engineer, Olin Dart, testified that a spiral was the geometric form preferred by highway designers as the ideal transition between a straightaway and a curved roadway. He described the spiral: "[It] starts with an infinite radius ... and it gets a smaller radius until it reaches the radius of the main curve, and then you come out by increasing the radius again to your tangent.... The natural path for a vehicle to follow, going from tangent line and the curve alignment is a spiral."
[2] Molbert remembered nothing from the night of the accident and did not testify at trial. Toepfer remembered virtually nothing from the time they left his apartment until the hospital. However, Toepfer testified that as friends reconstructed the evening's events for him, they refreshed his memory of his having been at Poets at some point in the night with Molbert. That is the extent of his memory.