| THIBODEAUX, Judge.
The State of Louisiana, through the Department of Transportation and Development (DOTD), appeals the issue of liability on a judgment, issued pursuant to a bench trial, which awarded $4,423,283.95 in general and special damages to the plaintiff, Melanie Ditch, $150,000 each to her two minor children, Kristin Ditch and Ryan Ditch, and $20,000 in loss of consortium *1282 damages to Ms. Ditch’s former husband, Melvin Ditch. The trial court concluded that the portion of the highway | ¿where the accident occurred contained design and construction defects which presented an unreasonable risk of harm and which contributed to the cause-in-fact of the injuries. It assessed fifty percent of the liability to DOTD and fifty percent comparative fault to the plaintiff, Melanie Ditch.
Both Melanie Ditch and Melvin Ditch answered the appeal. Ms. Ditch appeals the assessment of fifty percent of the fault to her and the inadequacy of the general damages and loss of consortium awards. Mr. Ditch also requests a reduction of the comparative fault assessment and desires an increase in the loss of consortium damages awarded to him.
It is well settled that an appellate court owes deference to a trial court’s factual findings. Absent manifest error on the part of the trial court, the reviewing court shall not set aside its findings. Rosell v. ESCO, 549 So.2d 840 (La.1989). Applying this standard, we affirm the judgment of the trial court finding no error in the trial judge’s apportionment of fault or assessment of damages. Additionally, we deny the relief requested on the plaintiffs’ answers.
We find the trial court’s factual findings and conclusions of law set forth in its written reasons for judgment to be legally sound and succinctly stated. We adopt them as our opinion.
Our able brethren of the trial court stated:
Melanie Ann Ditch Comeaux (Melanie Ditch), individually and as Tutrix of her minor children, Kristin and Ryan Ditch, together with her former spouse, Melvin Ditch, filed suit against the State of Louisiana, Department of Transportation and Development (DOTD).
Melanie Ditch claimed that on May 26, 1986, she was operating a 1983 Renault automobile and was traveling east from Broussard to St. Martinville on Louisiana Highway 96 (the Terrace Road) when suddenly and without warning her vehicle spun out of control and crashed violently into a westbound motorist. Ms., Ditch claimed that a defectively designed and improperly constructed curve on Highway 96 caused her to lose control of the vehicle.
laThe State filed an answer and claimed that Ms. Ditch lost control of her vehicle because she was exceeding the posted advisory speed for the curve. Particularly, the State claimed she was negligent because she was driving too fast around the curve in the rain. The State claimed that Melanie Ditch’s negligence was the sole, and only, cause of her injuries.
The case proceeded to trial on the merits on August 27, 28 and 29, 1997. At the conclusion of the trial, the Court ordered that post trial briefs and the transcript be filed, whereupon the matter would be submitted for the Court’s consideration. Having reviewed the post trial briefs and having been advised that no transcript had been ordered, the Court now renders its Reasons for Judgment.

DUTIES AND RESPONSIBILITIES OF STATE DOTD:

Campbell v. Louisiana DOTD, 94-1052 (La.1/17/95), 648 So.2d 898, at 901-02:
“[2] [3] Next, we must determine whether DOTD was at fault. DOTD’s liability may arise under a theory of negligence, La.Civ.Code art. 2315, or a theory of strict liability, La.Civ.Code art. 2317. The distinction between recovery under these theories is that under strict liability, the plaintiff is relieved of proving the owner or Custodian of the thing which caused the damage knew or should have know of the risk involved. See Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 (La.1982). Nevertheless, La.R.S. 9:2800 as applied to government defendants requires a plain *1283 tiff to prove that the public entity has “actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has faded to do so.” Therefore, under either theory the analysis is the same.
[4] [5] [6] In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, that defendant owed a duty to plaintiff which defendant breached and that the risk of harm was within the scope of protection afforded by the duty breached. Mundy v. Dept. Of Health and Human Resources, 620 So.2d 811 (La.1993). The duty of the state through DOTD is to keep the highways and its shoulders in a reasonably safe condition. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1172 (La.1986). This duty encompasses the obligation to protect a motorist who inadvertently drives onto the shoulder of the highway. Rue v. State, Dept. of Highways, 372 So.2d 1197, 1199 (La.1979). Whether DOTD breached its duty, that is, *902 whether the roadway at the scene of the accident was in an unreasonably dangerous condition, will depend on the facts and circumstances of Leach case. Hunter v. Dept. of Transp. and Dev., 620 So.2d 1149 (La.1993). Id. at 901-02.
The State argues that the DOTD’s failure to reconstruct the State’s highways to meet modern standards does not, in itself, establish the existence of a hazardous defect. See Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, (La.1986). However, as noted in Dill v. State, Department of Transportation and Development, 545 So.2d 994 (La.1989), Myers does not stand for the proposition that the State can escape liability simply by showing that a highway met the existing standards when it was built. Rather, the decision turns on determining whether the condition of the highway constituted an unreasonable risk of injury which caused the accident. “Design standards both at the time of the original construction and at the time of the accident may be relevant factors for consideration in deciding this issue, but are not determinative of the issue.” See Dill, supra, at 996.
THE CURVE IN QUESTION WAS UNREASONABLY DANGERO US
Throughout the trial on the merits, the plaintiffs counsel called the subject curve the “Melanie Ditch” curve. Plaintiffs Exhibit 15 is an aerial photo which clearly depicts the curve at issue. (Plaintiffs Exhibits 5a-5g also show the curve.) This Court concludes, as did the Court in Dill, supra, that this particular curve presented an unreasonable risk of harm and was defective, both as to design and as to construction. Moreover, the design and construction of this particular curve substantially contributed to the cause of this particular accident.
During the trial, the Court heard evidence that in 1953 this particular roadway, Highway 96, was converted from a gravel roadway to an asphalt or blacktop roadway. The plans and specifications and contract for the roadway work was filed in evidence (Plaintiffs Exhibit 3 and 4). This Court finds that this particular contract amounted to a “major reconstruction,” as that term is known in the jurisprudence of this State. See Hunter v. Department of Transportation and Development of State of Louisiana, 620 So.2d 1149 (La.1993).
The Court accepts the testimony of plaintiffs expert, Gerald Moody, as credible and believable, and supported by the evidence in this case. Mr. Moody testified that the conversion of Highway 96 from gravel to blacktop in 1953 was a major construction and/or “new construction” as opposed to a “mere overlay” of the highway with asphalt. As *1284 shown in plaintiffs Exhibits 3 and 4, the 1953 project contained, among other things, provisions for the following:
1) Grading sections;
2) Typical sections for shaping for the roadway;
3) Typical sections to where the embankment was to be raised;
4) Finished sections for shell base or gravel base;
5) Sections for the soil cement base;
| r6) Transitions of bituminous surfacing and base course at bridge ends;
7) Half sections showing the method of placing ballast and surfacing on bridges;
8) Superelevation sections and details;
9) Details of the initial intersection tie-in;
10) Horizontal layout of the entire project;
11) Vertical layout of the project;
12) Extensive rights-of-way acquisitions;
13) Extensive drainage work;
14) Extensive ditching;
15) Widening of the roadway;
16) Relocation of power poles;
17) Extensive fencing;
18) Extensive earthwork;
19) Extensive clearing;
20) Base and wearing course;
21) Removal and relocation of existing structures; and
22) Soil borings.
Thus, the 1953 project clearly called for a complete tearing up of the “old road” and a rebuilding of the subject road. The DOTD’s argument that this was a “mere overlay” job is unsupported by the record. This Court finds as a matter of fact that the 1953 project was a “major reconstruction” which was tantamount to “new construction” pursuant to Hunter, supra. Therefore, design and construction standards for “new construction” were applicable to this particular project.
The applicable standards for highway construction on this particular roadway in effect in 1953 were either the 1943 standards (P-29) or the 1946 standards (P-13), both of which mandated a degree of curvature of not more than six (6°) degrees for sixty (60) miles per hour in a rural setting [and/or seventeen (17°) degrees for thirty (30) miles per hour for an urban setting]. An engineer employed by the State Department of Highways (now DOTD) named “Neef” did a survey of the “Old Terrace Road” (State Highway 96). The Road was a narrow, gravel road and had many curves, such as the “Melanie Ditch” curve at the intersection of Highway 96 and “the Ozenne Road”. Mr. Neefs notes were filed in evidence in this case (P-11 and 11a) and show that this particular curve had a twenty-five (25°) degree curvature, excessive for even an urban setting, and far in excess of the six (6°) degree curvature for this roadway. Moreover, the curve was a “compound” curve (P-32). Just where the degree of curvature is the greatest, there is another curve, requiring a motorist to turn again. According to all of the engineers, this type of curve should be avoided, and instead a gradual curve having the same “radius” throughout should be used.
This Court finds as a matter of fact that this degree of curvature was excessive and did constitute a design and a construction defect in the roadway in question, as did the “compound” nature of the curve. No evidence was presented to justify the deviations from the standards of the | (¿Department of Highways, and no explanation was given as to why the State did not design, and insist that the contractor construct, the curve in accordance with existing standards in 1953. The State likewise introduced no evidence to show that it was either physically incapable or that it was financially impracticable for them to meet the *1285 guidelines to make this particular curve safe when this highway was originally re-constructed in 1953.
In fact, Guy Leonard, III, the DOTD’s Civil Engineer in charge of road design, testified that sufficient right-of-way existed at this particular curve site to bring the curve in question within the 1943 and 1946 design standards at minimal additional costs. In addition, Mr. Leonard testified that had the project been undertaken in 1953, the net cost would have been only about $15,000.00 to $20,000.00 to have “straightened out” the complexity of curves shown on aerial photos and in the later “Babin” survey in 1979, (P-12 and 12a). Therefore, for almost no extra money the State could have required correction of the excessive degree of curvature and removed the compound nature of the curve in 1953. And for only a modest cost, the State could have “straightened out” all three curves as shown on the later Babin survey. In fact, the plaintiff introduced evidence to show that in 1953, the State may have acquired sufficient right-of-way to “straighten out” these three curves, and no satisfactory explanation was given as to why that was not accomplished in 1953. (See P-22, 22a, 22b, 23, 24, 33, 34, 35).
The “Babin” survey, done by State Civil Engineer Teddy Babin in 1979, depicts the engineering work that was required to “straighten out” the three curves. As to why the work was not accomplished as per Mr. Babin’s survey, the State offered only speculation that perhaps the St. Martin Parish Police Jury was supposed to acquire the right-of-way to enable the work shown on the Babin survey to be done, and perhaps the Parish could not or did not acquire the right-of-way (P 25a, 25b, 25c, P 25, 1, 2, 3, 4, 5, 6, 7, 8, 9). No credible evidence was introduced to show that the St. Martin Parish Police Jury had agreed to pay for the right-of-way for this State highway. In fact, the evidence that the plaintiff introduced was that some, if not all, of the required right-of-way had already been acquired by the State in 1953. No good explanation was offered as to why the State did not follow the Babin survey in 1979 and redesign the three curves in question in conformity therewith. The evidence presented at the trial was that the redesign could have been accomplished in 1979 at a relatively modest cost, perhaps from existing budgetary sources within the Department of Highways, at the same time as the 1979 “overlay project” shown on Exhibit D-l.
What is particularly significant in this case, however, is that the 1979 Babin survey actually went on to measure the angles of this particular curve as it existed. The “Babin” survey which duplicated Bill Neefs 1953 findings, found that in 1979, all of the angles as to this particular curve were accurate. In other words, this curve was designed and constructed in violation of the 1943 and 1946 design and construction standards for this type roadway because it had a twenty-five |7(25°) degree curvature. The “compound” nature of the curve, as shown in the “Neef’ notes and the “Ba-bin” survey, also violated the design and construction standards.
The 1979 “overlay” project performed by the State on this particular roadway was a true overlay project. Supposedly, according to the State’s argument, there was no requirement that the State had to follow its own guidelines that were applicable to a “major re-construction”. According to this logic, the State could simply overlay the existing roadway as is and not even consider the fact that the 1953 project was a “major reconstruction” and that the “Neef Notes” showed clearly that the roadway was not built in accordance with proper standards then in existence. Additionally, the State would also have to overlook the fact that in 1979, Mr. Babin found that the existing roadway was not constructed according to standards. This Court respectful *1286 ly declines the invitation to apply this type of logic.
The evidence at the trial was that this particular curve could have been reconfigured in the 1979 overlay project to remove the excessive curvature and remove the compound nature of the curve at a minimal cost to the State of Louisiana. (D-1 shows the project was actually done in 1980.) Sufficient right-of-way was already in place according to Mr. Leonard, and any additional work on the embankments necessary to bring the curve within standards would have been minimal. Still the State failed to act, and the highway was allowed to be overlaid with the existing curvature and compound curve problem. Not only was the “Babin” plan to “straighten out” the three curves not followed, but this particular curve was not corrected. The Court finds that the State clearly had notice of the defect under R.S. 9:2800 both from the “Neef” notes, the “Babin” survey. The State had many opportunities to correct the problem at minimal cost prior to this accident. The State’s failure to act constitutes negligence. The curve constituted a “defect” which presented an unreasonable risk of harm. (See Campbell and Dill, supra).
In determining that the curve in question did present an unreasonable risk of harm, the Court considered the jurisprudence suggesting the Court “balance” several factors: The probability and gravity of the harm presented by the risk and the social utility of the thing involved. This particular curve because of its excessive curvature and compound nature, presents an “unusually” high risk of harm to motorists. Although the highway itself has a high social utility because it is the only route between Highway 90 and St. Martinville, the curve (as designed) has almost no social utility and should have been reconfigured by the State. The cost to the State of avoiding the risk by correcting the problem was minimal. The overall social utility of the plaintiffs conduct is not a relevant factor in this case. She was simply using the roadway. However, her speeding and driving too fast for existing conditions were taken into account by assessing her with fifty (50%) percent of the fault. (See discussion below.) See, e.g., Miller v. State, DOTD, 95-548 (La.App.3 Cir. 3/20/96), 679 So.2d 134, writ denied.
|sThe Court therefore finds that at the time of this accident, the excessive curvature and the compound nature of the curve was a cause in fact of Melanie Ditch losing control of her vehicle and her resulting collision and injuries. The Court also finds that Ms. Ditch lost control of her vehicle right at the critical junction of the curve in question where it became a compound curve. She lost control because of the excessive angle of the curve and because of the compound nature of the curve. The negligence of the State and the design and construction defect was a cause in fact of the collision in question. In so finding, the Court accepts the opinion testimony of plaintiffs expert, Gene Moody, as credible, believable and persuasive. His opinion is corroborated by other credible evidence and by the deposition testimony of the eyewitness, the westbound driver struck by Ms. Ditch who testified that Ms. Ditch lost control “in the middle” of the curve right at the location where it became a “compound” curve.

FAULT OF MELANIE DITCH

There is no question that the fault of Melanie Ditch also played a substantial part in causing this particular collision. Able and astute counsel for the plaintiff attempted to persuade this Court that the curve in question had the wrong sign (it did) and that the speed advisory posted was improper (it was). However, this Court finds as a matter of fact that the placement of the curve advisory sign, the fact that the curve *1287 advisory sign was the wrong sign, and the fact that the advisory sign was improperly posted at 35 MPH instead of a lesser speed, were not causes in fact of the collision in question. Melanie Ditch testified under cross examination that she was totally familiar with this road, having traveled it extensively over her lifetime. On the day in question, she was simply going to St. Martinville from Lafayette after work to pick up her mother who was playing cards with friends. No evidence was presented to show that she was in a hurry or that she had any reason to rush. Ms. Ditch was unable to testify at the trial concerning what happened on the day in question because of memory loss caused by the severe injuries that she sustained. Likewise, no evidence was presented by either party to show that Ms. Ditch was unaware of the dangerous nature of the curve or the fact that one had to drive relatively slow around the curve. The evidence presented established to this Court’s satisfaction that at the very least Ms. Ditch was traveling 45 MPH at the time she lost control of her vehicle, that it was raining, and the roadway was wet. Ms. Ditch knew, or should have known, that the curve simply could not be handled at that speed, particularly under those weather conditions and road conditions. Ms. Ditch’s excessive speed under the circumstances therefore was a major contributing cause to the collision.

ALLOCATION OF FAULT

This Court has given long and careful consideration to allocating fault in this case. Important to the Court’s decision is the fact that this particular curve has been a “dangerous” curve ever since the roadway has been used by the traveling public. And at least since 1953, the State of [9Louisiana had particular and specific knowledge that this curve exceeded the design standards in existence since 1943 and 1946 for roadways of this type. No justifiable reason or excuse was presented as to why this particular curve was not redesigned and reconstructed in 1953 when the roadway was initially paved. Likewise, this Court is baffled by the fact that the State’s engineer, Teddy Babin, drew up a specific diagram to “straighten out” the three curves in question and yet, the State failed to take any action. Particularly troublesome is that even if the State had decided that it could not afford to re-construct these three curves as per the “Babin” survey, or could not do the work necessary to “straighten out” the three curves for whatever reason, there is absolutely no justification or excuse for not reconfiguring this particular curve to bring it up to minimum design standards when the overlay project was done in 1979 (1980). The State had specific notice in 1953 and again in 1979 that the curve was not designed or constructed properly in accordance with the State’s own standards and guidelines in existence since 1943 and 1946.
It is also significant to note that the State had it’s own expert present throughout the trial and yet, when it came time for this expert to testify, the State chose not to call him. While there is certainly no presumption applied that the expert’s testimony would be adverse to the State’s position, this Court can evaluate the evidence or lack of evidence on a given point at issue in reaching a conclusion. There is a total lack of evidence to explain why this roadway was not re-designed to remove these three curves or, at the very least, to re-configure this particular curve to remove the excessive angle and “compound” nature of the curve.
The State attempted to introduce two accident reports in evidence to show that there had only been two wrecks at this curve. The argument the State makes is that based on the traffic count for this roadway, the curve in question can’t be dangerous because of the lack of reportable accidents. This argument begs the question. The Court is particularly puz *1288 zled by the introduction of the reports in view of the State’s own Motion in Li-mine to exclude this type of evidence as impermissible under 23 USC 409, a Wiedeman v. Dixie Electric Membership Corporation, 93-CC1314, 93-CC1318, 93-CC1352 (La.11/29/93), 627 So.2d 170; and Reichert v. State, Department of Transportation and Development, 96-C-1419, 96-C-1460, (La.5/20/97), 694 So.2d 193. At trial, this Court overruled the State’s Motion in Limine for oral reasons assigned. The “Babin” survey and the “Neef Notes” were clearly not information gathered under 23 USC 409. The reports of the two accidents were introduced by the State. The Court finds no “409” issues in this case.
The Court finds that the State’s argument concerning the lack of accidents at this curve is completely unpersuasive. The expert testimony from Mr. Moody and the State’s own engineers established beyond question that the “Melanie Ditch” curve was designed and constructed improperly. The Court has no way of knowing whether the accident reports are inclusive of all accidents at or near this location for any given |intime period. How many motorists “spun out” and didn’t wreck? How many others had near misses, went in the ditch or otherwise had problems negotiating this curve? The Court rejects the State’s argument.
It is also important to this Court’s allocation of fault that Melanie Ditch was at all times pertinent hereto a hardworking, industrious young mother. She was honest and credible. This accident did not happen at night, while improperly passing, or at any time when Melanie had been drinking or under the influence of any intoxicating beverages. There was no evidence of horseplay, of “hot dogging”, of reckless driving or anything of the type. Melanie was simply on her way to pick up her mother in St. Martinville when she lost control of her vehicle. She should have known better than to be driving 45 MPH in the rain on this particular curve since she had used this roadway so many times in the past, but she had done nothing out of the ordinary After having reviewed the jurisprudence submitted by both parties, along with the Court’s independent research, this Court allocates fault at fifty (50%) percent to Melanie Ditch and fifty (50%) percent to the State of Louisiana. See Rhodes v. State, DOTD, 95-CA-1848 (La.5/21/96), 674 So.2d 239; Campbell v. Louisiana Department of Transportation and Development, 94-1052 (La.1/17/95), 648 So.2d 898; Dill v. State, Department of Transportation and Development, 545 So.2d 994 (La.1989); Molbert v. Toepfer, 550 So.2d 183 (La.1989); Hunter v. Department of Transportation and Development of State of Louisiana, 620 So.2d 1149 (La.1993); Miller v. State, DOTD, 95-548 (La.App. 3 Cir. 3/20/96), 679 So.2d 134; Brown v. Louisiana Indemnity Company, 96-1393 (La.App. 3 Cir. 4/23/97), 693 So.2d 270; Thornhill v. State, Department of Transportation and Development, 95-CA-1946 (La.App. 1 Cir. 6/28/96), 676 So.2d 799.
In allocating fault, the Court has especially considered the case submitted by the State, Phillips v. Alliance Casualty and Reinsurance Company, 95-2161 (La.App. 1 Cir. 11/8/96), 689 So.2d 481. The State argues that in the case sub judice, the plaintiffs own expert, Mr. Moody, testified that, as in Phillips, supra, if Ms. Ditch had not been traveling the curve at an excessive rate of speed under the circumstances, the accident would not have happened. A five (5) judge panel of the First Circuit, with two dissents, reversed the trial Judge who had allocated fault at fifty (50%) percent to the DOTD and fifty (50%) percent to the speeding driver, and placed total blame on the speeding driver. This case stands on it’s own facts and that Panel’s interpretation thereof. This Court’s ruling as to liability and causation in this particular case has *1289 been carefully considered and is fact peculiar to this particular curve and this particular driver.

DAMAGES

Plaintiffs pre-trial memorandum itemizes with great particularity the overwhelming injuries and damages suffered by Melanie Ditch as a result of this accident. (See P 31). The Court incorporates plaintiffs | -, 1 factual summary shown on P-31 on the issue of damages as part of its reasons for judgment.
This Court also relies heavily on the deposition testimony of Dr. Kenneth McCarran who summarized all of the injuries sustained by Ms. Ditch. No evidence was introduced by the State of Louisiana on the issue of damages, so the only evidence before the Court is the evidence submitted by the plaintiff. This Court feels that some of the requested special damages, such as the future life care appear somewhat inflated. Yet the State presented no argument that the plaintiffs request were not supported by the evidence. Therefore, the Court feels constrained to award special damages in accordance with the plaintiffs request as following:
Special Damages
(1) Medical Expenses Past $ 428,861.95
Future (Life Care Plan) 2,120,480.00
TOTAL MEDICAL EXPENSES: $2,549,341.95
(2) Wages and Employment Fringe Benefits Past:
May 1986 — September 9,1996 $ 361,262.00
September 10,1996 — August 25,1997 36,000.00
SUBTOTAL PAST: 397,262.00
Future " 476,680.00
TOTAL WAGE/BENEFITS: $ 873,942.00
RECAPITULATION
Medical Expenses $2,549,341.95
Wages/Benefits 873,942.00
TOTAL $3,423,283.95
As to general damages, the plaintiffs pre-trial brief, and P-31 correctly summarizes the massive and extensive injuries suffered by the plaintiff and is adopted by the Court. According to the plaintiffs brief, general damages for this type of injury range between $5,000,000.00 and $6,000,000.00. See Simpson v. State through DOTD, 636 So.2d 608, (La.App. 1 Cir.1993); Jenkins v. State, Department of Transportation and Development, 619 So.2d 1188, (La.App. 1 Cir.1993).
However, according to the post-trial memorandum on the issue of damages filed by the State, the most recent case of Whiddon v. Hutchinson, 94-2000 (La.App. 1 Cir. 2/23/96), 668 So.2d 1368, affirmed an award of $821,000.00 total to a 33-year old woman who sustained a severe closed head injury, brain damage and permanent residuals. The Whiddon case is very similar to the case at bar, though the injuries in that case did not appear to be quite as severe.
hpThis Court has further reviewed additional cases cited by the State in its post trial brief, Molbert v. Toepfer, 550 So.2d 183 (La.1989); Bernard v. Lott, 95-0167 (La.App. 4 Cir. 12/28/95), 666 So.2d 702; Kramer v. Continental Casu *1290 alty Co., 92-1131 (La.App. 3 Cir. 6/22/94), 641 So.2d 557; Pino v. Gauthier, 633 So.2d 638 (La.App. 1 Cir.1993); and especially Boykin v. Louisiana Transit Company, Inc., 95-888 (La.App. 5 Cir. 6/25/96), 676 So.2d 1100. The Boykin case discusses injuries similar to plaintiffs with a Nine Hundred Thousand ($900,000.00) Dollar general damage award.
Even though the only evidence presented is plaintiffs uncontradicted and uncontroverted evidence, this Court feels that an award in the range suggested by the plaintiff is not warranted and that the awards shown in the cases cited by the defendants are more in line with the type of award that should be made in this particular case. Based on all of the facts and circumstances of this case and a review of the jurisprudence, this Court finds that an award of ONE MILLION AND NO/100 ( $1,000,000.00) DOLLARS in general damages is fair, just and reasonable under the circumstances of this case for the injuries sustained by Melanie Ditch, past, present and future. The Court declines invitation to break down the award to include the four elements of general damages outlined by the Louisiana Supreme Court in Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), but has considered all four elements and all other relevant factors in arriving at the total general damages for Melanie Ditch.

LOSS OF CONSORTIUM FOR KRISTIN AND RYAN COMEAUX

In her pre-trial memorandum, Ms. Ditch outlined the seriousness of her injuries and how it affected her minor children, Kristin and Ryan. The Court adopts the factual summaries in the plaintiffs pre-trial memorandum on this issue as it’s own findings. Further, the Court had a chance to see and observe the children as they took the stand, and both still appeared to be greatly affected by the injuries to their mother. Based on all of the facts and circumstances presented, the Court feels that an award of ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) DOLLARS to each child would be equitable, fair, just and reasonable.

LOSS OF CONSORTIUM TO MELVIN DITCH

The evidence at the trial convinced this Court that Melvin Ditch and his wife were not getting along very well at the time of this particular injury. Following Mrs. Ditch’s serious accident, Mr. Ditch visited her a few times in the hospital and naturally was affected to some extent by the injuries to his then wife. However, within a relatively short period of time, Mr. Ditch stopped his regular visits to the hospital. Upon her discharge from the hospital, Ms. Ditch lived with her mother, and Mr. Ditch attempted to have Ms. Ditch put in a nursing home. The evidence indicated that he failed to provide very much, if any, financial and emotional support to Mrs. Ditch. Mr. Ditch’s attempt to present evidence |13to the contrary through his own self-serving testimony is not persuasive. The Court feels that an award of TWENTY THOUSAND AND NO/100 ($20,000.00) DOLLARS to Mr. Ditch for his loss of consortium under the facts and circumstances of this case is generous.
*1291 RECAPITULATION
Melanie Ditch:
Special damages . $3,423,283.95
Past, present and future general damages. 1,000,000.00
TOTAL FOR MELANIE DITCH. $4,423,283.95
Kristin Comeaux, loss of consortium. $ 150,000.00
Ryan Comeaux, loss of consortium. $ 150,000.00
Melvin Ditch, loss of consortium. $ 20,000.00

CONCLUSION

The “Melanie Ditch” curve at the intersection of Ozenne Road and Highway 96, (the Terrace Road) is unreasonably dangerous. The curve, as reconstructed in 1953 and as overlaid in 1979 (or, 1980) and as it existed at the time of Melanie Ditch’s collision and injuries in 1986, is defective both as to design and as to construction and presented an unreasonable risk of harm to the traveling public in general and to Melanie Ditch in particular. The excessive curvature of the roadway as well as the “compound” nature of the curve was a substantial contributing cause to the collision in question in this case. Melanie Ditch’s excessive speed in the rain on a roadway with which she was thoroughly familiar also amounted to a violation of the standard of care owed by her and was a substantial contributing cause to this collision and to her injuries. Liability shall be allocated at fifty (50%) percent to Melanie Ditch and fifty (50%) percent to the State of Louisiana, Department of Transportation and Development. Damages are hereby awarded to Melanie Ditch in the total sum of FOUR MILLION FOUR HUNDRED TWENTY-THREE THOUSAND TWO HUNDRED EIGHTY-THREE AND 95/ioo ($4,423,283.95) DOLLARS, and to Kristin Comeaux in the total sum of ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) DOLLARS, and to Ryan Comeaux in the total sum of ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) DOLLARS, and to Melvin Ditch in the total sum of TWENTY THOUSAND AND NO/100 ($20,000.00) DOLLARS, all of which said sums are to be reduced by fifty (50%) percent on the basis of the comparative fault of Melanie Ditch. Legal interest is to be awarded from date of judicial demand. Court costs are assessed at fifty (50%) percent to the plaintiffs and fifty (50%) percent to the State of Louisiana, Department of Transportation and Development.

.CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the State of Louisiana, through the Department of Transportation and Development in the amount of $19,640.97.
AFFIRMED.