502 So.2d 1383 (1987)
Ricky D. LEDBETTER
v.
STATE of Louisiana, Through the LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 86-C-0423.
Supreme Court of Louisiana.
February 23, 1987.
Harvey Lee Hall, Baton Rouge, for applicant.
Gracella C. Simmons, Simmons, Zelden & DeFrances, Baton Rouge, Richard R. Kennedy, Lafayette, for respondent.
LEMMON, Justice.
In this one-vehicle accident case, the principal issue is whether the court of appeal erred in modifying the judgment of the trial court (which had found plaintiff to be totally at fault) and rendering a judgment holding that the Department of Transportation and Development was sixty per cent at fault for the accident. We conclude that the Department's fault in failing to place a warning sign notifying approaching motorists of a ninety-degree curve was a concurrent cause of this accident on a dark night with patchy fog in an unlighted area, when there were no edge stripes, no visible center line stripes and no other warning of a change of direction, and when the main blacktop road curved left with an unmarked blacktop road continuing straight ahead to a T-intersection.
*1384 The early morning accident occurred when plaintiff failed to negotiate an unmarked ninety-degree left turn on a rural highway near Duson in Lafayette Parish and struck a tree after leaving the roadway. The configuration of the roadway and the path of plaintiff's car are shown on the attached sketch which was introduced into evidence:

*1385 At the time of the accident, plaintiff was living in Lake Arthur, having moved there from Texas a few weeks previously. He was totally unfamiliar with the Duson area where the accident occurred. Earlier in the evening of the accident, plaintiff had driven from Lake Arthur by way of Interstate Highway 10 and had taken the Duson exit and driven south on Louisiana Highway 95 in order to reach U.S. Highway 90, which ran parallel to I-10. Following friends in another car, he turned left off of LA. 95 onto U.S. 90 and drove several miles to a night club, where he attended a dance.
During the evening, plaintiff danced and listened to the music, having about three alcoholic beverages (according to his testimony which was corroborated by his companions). At about 1:00 a.m., he and his friends left the dance to return to Lake Arthur, where he was scheduled to report to work as a pipefitter at 7:00 a.m. Driving the lead vehicle on U.S. 90 on the return route, plaintiff saw a highway sign directing traffic to I-10 and accordingly turned right onto old LA. 95. Although the road onto which plaintiff turned appeared to be the same straight road on which plaintiffs had traveled earlier in the evening, old LA. 95 was a different road which, unknown to plaintiff (who had never driven on either road before that evening), made a ninety-degree turn to the left (as shown on the sketch above) and joined the new LA. 95 before reaching I-10. Plaintiff failed to negotiate the curve when he apparently continued straight on the right fork before realizing that the main road curved to the left. He then proceeded along the path shown on the sketch, but struck a tree north of the highway before he was able to accomplish reentry onto the main road.
After trial on the merits, the judge, noting that the distance between the point where plaintiff indicated on the sketch that he first realized the road was curving and the point where he eventually left the northern edge of the roadway was 110 feet, concluded that plaintiff could have easily stopped within that distance at twenty-five miles per hour, the posted speed limit in the area.[1] The judge further concluded that the absence of warning signs did not relieve plaintiff of his duty to use reasonableness, prudence and care. Accordingly, the judge found plaintiff was 100 per cent at fault and dismissed the suit against the Department.
On appeal, the intermediate court reversed and held that the fault of both parties combined to cause the accident. 482 So.2d 1035. Noting that plaintiff was generally exercising reasonable care and otherwise had his vehicle under control prior to being confronted with an unmarked dangerous curve, the court concluded that plaintiff more probably than not would have heeded warning signs (if signs had been in place) by reducing his speed and held that the absence of warning signs was a concurrent cause of the accident. The court allocated sixty per cent of the fault to the Department and forty per cent to plaintiff. On the Department's application, we granted certiorari, primarily to review the reversal of the trial court's finding that the Department's fault was not a concurrent cause of the accident. 487 So.2d 432.
Old LA. 95 was marked for several blocks after its intersection with U.S. 90 with signs indicating a speed limit of 25 miles per hour.[2] Although plaintiff, to his testimony, did not notice these signs, he was driving thirty to thirty-five miles per hour until his visibility became impaired by patches of fog and he reduced his speed. He had resumed speed up to twenty-five to thirty miles per hour when he was suddenly confronted with a left turn on the banked curve. He removed his foot from the accelerator as he drove across the triangular median composed of gravel and *1386 grass and attempted to follow the turning roadway. However, he was unable to reenter the roadway and entered a ditch on the north side of LA. 95, finally running into a tree about sixty-five feet (by measurement on the sketch which was drawn to scale) from the point where he was last on the roadway surface.
The only advance warning of the curve was a white arrow below a green route marker indicating the highway number, located about 480 feet before the turn. However, the branches of a nearby tree prevented an approaching motorist from seeing the route marker or the arrow. An expert horticulturist analyzed the rate of growth of the branches and estimated that the branches had obscured the sign for three to four months before the accident.[3]
The trooper who investigated the accident confirmed that plaintiff was not intoxicated, although he smelled a slight odor of alcohol on plaintiff's breath. The officer found no skid or scuff marks on the roadway, but did find vehicle tracks across the grassy median and at the point where the truck left the roadway. He also traced the path of the truck through the ditch to the point of impact. He did not recall whether there were any signs warning of the turn or any stripes along the edge or the center line of the roadway.
The lady driving the second vehicle in the two-vehicle caravan testified that the night was dark and foggy, that she did not recall any white edge stripes or yellow center line stripes, and that she was familiar with the road and looked for, but did not see, signs warning of the curve as they approached the area. She also confirmed that plaintiff's driving was not reckless or excessively fast and that she felt safe with her daughter in plaintiff's truck. The daughter testified that she did not realize they had reached the curve until she felt the truck leave the road surface.
Each side presented a traffic engineering expert, and plaintiff additionally presented an accident reconstruction expert. The experts agreed that the primary purpose of warning signs on highways is to alert unfamiliar motorists to unexpected hazards or sudden changes in road configuration or condition. The experts disagreed, however, whether a yellow sign warning of the upcoming curve was necessary in this particular area.
Testing with a ball-bank indicator revealed that the recommended safe speed for driving in the turn to the left was twenty miles per hour. Because the posted speed limit in the area was twenty-five miles per hour, and because he believed the curve could be negotiated safely driving at the posted speed, the Department's expert opined that no warning sign was necessary. He admitted being aware of the provision in the Louisiana Manual of Uniform Traffic Control Devices which states (in paragraph 2-C4) that a warning sign is intended for use when engineering investigation of roadway geometric and operating conditions shows a recommended safe speed on a turn of thirty miles per hour or less, and when the recommended safe speed is equal to or less than the posted speed limit. However, he pointed out that a warning sign is only intended, but not required, under those conditions. He further noted that there were 1,250 to 1,300 vehicles per day using LA. 95 and that the accident under consideration was only the second one in three years, the other occurring when a motorist attempted to negotiate the curve at forty miles per hour.[4] Because *1387 the expert negotiated the curve safely at twenty-five miles per hour and because the accident records indicated that other drivers had no problem in negotiating the curve, he opined that the unmarked curve did not constitute a hazard. He further opined that no warning sign was required because of the visibility and available sight distance in a twenty-five mile per hour zone.[5] In summary, he saw no reason why a motorist would run off the road while driving within the speed limit, although the unsigned curve would admittedly be hazardous in a zone with a limit of thirty-five or forty miles per hour.
The experts presented by plaintiff, on the other hand, expressed the view that the totality of the circumstances existing in the area required some type of warning in order to alert an unfamiliar motorist that the roadway was making a ninety-degree turn to the left. The night was dark and overcast, with patches of fog; the area of the curve was unlighted and "pitch black", according to the trooper; there were no white stripes on the edge of the roadway; there were no road reflectors on the center line, and the yellow stripes were so faded that they could hardly be seen, even in daylight; and the blacktop roadway made a sudden turn to the left, with a similar blacktop roadway continuing straight ahead, all without any warning whatsoever. These circumstances, according to the experts, caused confusion and disorientation for a motorist who had never been on the highway before. The experts concluded that the total absence of any type of warning in the area, combined with the lack of contrast between the dividing roadways on a dark night in an unlighted area, dictated the necessity of a yellow sign with a black arrow warning of the ninety-degree curve.
The Department had in fact placed a warning arrow below the route marker approximately 480 feet before the curve. However, as noted above, that warning arrow was obscured by the branches of a nearby tree. While that sign was not the type advocated as necessary by plaintiff's experts, the sign (if visible) would at least have provided some warning of the upcoming change in the configuration of the road. Similarly, white edge stripes or visible yellow center line stripes would have provided some warning to an unwary motorist of the upcoming change in direction. Plaintiff's experts emphasized that the total lack of any type of warnings created a trap for the unwary plaintiff who had never driven on this road before and who reasonably believed that he was on the same straight road he had taken in driving to the dance.
As to plaintiff's speed, the accident reconstruction expert calculated the curve's critical speed (the speed above which a vehicle will go out of control and begin to side slip on a curve) at twenty-nine miles per hour. Because there were no slide or scuff marks, he opined that plaintiff did not exceed the critical speed and did not lose control of the vehicle as he made the left turn maneuver.
The trial judge ruled that the highway was defective because of the lack of warning signs. He found, however, that the Department had "overcome the presumption" by establishing that plaintiff was traveling at an excessive rate of speed and that his inattention caused him not to realize the road was curving as early as he should have. In commenting that the absence of warning signs did not relieve plaintiff of the duty to drive carefully, the trial judge failed to recognize that the Department owes a duty to warn of hazardous conditions not only to prudent and attentive motorists, but also to those who are slightly exceeding the speed limit or who are momentarily inattentive. See Burge v. *1388 City of Hammond, 494 So.2d 539 (La. 1986).
Because of this approach, the trial judge did not reach the determination whether there was concurrent fault by both parties. In making that determination, we conclude that fault was established on the part of both parties, even when the evidence is viewed in the light most favorable to the party which prevailed in the trial court. The Department's position is simply untenable that the otherwise unmarked ninety-degree curve in the roadway did not require any warning other than a twenty-five mile per hour speed limit sign, especially when one considers that an unmarked road also forks to the right.
The pertinent additional inquiry is whether the fault of each party was a legal cause of the accident which requires that party to respond in damages. The intermediate court concluded that the accident occurred because plaintiff did not realize there was a dangerous curve in the road in time to negotiate it safely. The court further concluded from the record that despite plaintiff's inattention and slightly excessive speed, more probably than not he would have heeded warning signs and slowed down his vehicle to negotiate the curve safely. We agree. Adequate warning, such as curve signs or roadway stripes, would more likely than not have prevented this accident; conversely, the total lack of any warning signs whatsoever was a cause-in-fact of the accident. Since the Department had a duty to warn under the existing circumstances and since the risk to plaintiff was within the scope of that duty, the Department's breach of that duty requiring a response in damages was a concurrent legal cause of the accident. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970). We therefore reject the Department's first two assignments of error (those which prompted the granting of certiorari) concerning whether the Department was guilty of fault which was a concurrent cause of the accident.
The Department's last two assignments of error question the appellate court's apportionment of fault and the amount of damages awarded for loss of future earnings or impairment of earning capacity. The court of appeal considered and discussed the apportionment factors outlined in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). We cannot say that the allocation of sixty per cent of the fault to the Department was not just and proper on the record, and we would not have granted certiorari on this issue alone.
As to impairment of earning capacity, the Department's one-paragraph brief on the issue does not convince us of error by the court of appeal, and we would not have granted certiorari on this issue alone.[6]
Accordingly, the judgment of the court of appeal is affirmed.
NOTES
[1] The two points are marked A and B on the annotated exhibit, above.
[2] The distance between the junction of old LA. 95 and U.S. 90 and the point of the accident was not indicated in the record, except for a statement that the last speed limit sign on northbound old LA. 95 was 0.3 miles from U.S. 90. However, an exchange between the judge and one witness could reasonably lead one to believe that the distance between the two points was not much greater than 0.3 miles.
[3] The Department's signing and traffic supervisor for the district testified that his crew tried to check for overhanging branches at least every six months and that the records indicated the last work in that area was about four months before the accident (at which time, according to the expert, the branches were obscuring the sign).

The horticulturist visited the scene again one month before trial and found that the sign was again obscured.
[4] The trial judge relied heavily on these statistics. He calculated that 1,300,000 vehicles had traveled LA. 95 in a three-year period in which there was only one other accident in that curve, an accident which involved excessive speed. However, the statistic did not differentiate between the two LA. 95 roads. The new LA. 95 was the principal connecting road between I-10 and U.S. 90 and presumably carried the majority of the traffic. There was testimony that old LA. 95 was primarily used by local residents.
[5] The Department's expert, noting the statutory requirement that headlights must illuminate at least 150 feet on low beam, asserted that plaintiff should have been able to stop within the sight distance of his headlights if he had been traveling at twenty-five miles per hour. This theory assumed that plaintiff should have reacted within the normal reaction time that an average motorist reacts to an easily perceivable hazard such as a pedestrian or another vehicle. Moreover, the doctrine of assured clear distance has been rejected by this court in Craker v. Allstate Insurance Co., 259 La. 578, 250 So.2d 746 (1971).
[6] In its writ application, the Department contended that plaintiff's economist failed to consider that his former employment would have required frequent moves and resulting periods of unemployment. In its brief in this court, the Department contended that since plaintiff admitted he might be able to become a "fully qualified plumber", entitled to approximately the same wages he earned as a pipefitter, the award should be limited to the period of time that plaintiff is less than a "fully qualified plumber".