FORET, Judge.
This action arises out of a one-vehicle accident which occurred in the early morning hours of March 30,1985, in the Town of Mansura. The accident occurred when Wilbert Stovall, defendant herein, drove through a barricade into a railroad crossing which was under repair. As a result of the accident, Stovall’s passengers and plaintiffs herein, Vincent Berry and Evelina Ceasar, were injured. Also named as defendants were the Town of Mansura, Kansas City Southern Railway Company (Railroad), and Gordon LaCour, engaged by the Railroad to provide the heavy equipment and an operator to repair the crossing.[1]
After trial, the court issued oral reasons on the issue of liability and written reasons on the issue of damages.
Judgment was rendered in favor of Vincent Berry in the amount of $3,000.00 for pain and suffering and general damages, and in the amount of $1,111.16 for medicals, for a total of $4,111.16, plus legal interest from date of judicial demand until paid. Judgment was rendered in favor of Evelina Ceasar in the amount of $15,500.00 for pain and suffering and general damages, and in the amount of $12,537.32 for medicals, for a total of $28,037.32, plus legal interest from date of judical demand until paid. Stovall was found to be 80% at fault and the Railroad and Town of Mansu-ra were each found to be 10% at fault in causing the accident. Additionally, the trial court found in favor of the Railroad and the Town of Mansura on their reconven-tional demand against Stovall for that portion of the judgment in favor of Ceasar, which they may be required to pay, which is in excess of 10% each of the total.'
Appellants include defendants, Kansas’^ City Railway Company, the Town of Mari-sura, and Wilbert Stovall and his insurer, Southern Security;;-.'Insurance Company. Plaintiffs, Berry and peasar, answered the appeal.
FACTS
Wilbert Stovall, Evelina Ceasar, Vincent Berry, and Octavia Bazile were traveling home to the Mansura/Marksville area from Eunice. On the way home, the four stopped at a lounge in Mansura operated by Merlin Sampson where Stovall and Berry split a half-pint of gin. From the lounge, the four proceeded to Octavia’s house, a few blocks from the scene of the accident, where she was dropped off. From Octavia’s house, Berry and Ceasar, with Stovall as driver, proceeded to cross a railroad track which was under construction. Stovall’s truck dropped into a large hole which was part of the construction project, stopping short and injuring both Berry and Ceasar.
Berry and Ceasar were transported by ambulance to a nearby hospital, while Sto-vall was taken to the police station. There, after proper testing, Stovall was shown to have a blood alcohol level of 0.219 and was charged with driving while intoxicated and failure to maintain control of his vehicle.
As a result of the accident, Berry sustained muscle and ligament strain in his neck and lower back. Ceasar sustained neck and back injuries, in addition to a bump on her head. Subsequent to the accident, Ceasar suffered four “blackouts” resulting in falls. One fall resulted in a broken wrist; while another fall resulted in a broken jaw. At the time of trial, Ceasar had not had a “blackout” spell for a period of approximately one year before trial.
ASSIGNMENTS OF ERROR
Errors are assigned as follows by the respective parties.
STOVALL’S NEGLIGENCE
Stovall contends that the trial court erred in finding him 80% at fault in causing the accident. He bases this contention upon the allegation that the railroad crossing, which was under repair, had no barricades or warning signs and therefore, con *776 stituted a “trap” or intervening cause, which resulted in the plaintiffs’ injuries.
At trial, the testimony was conflicting as to whether any barricades were present at the railroad crossing. There was testimony that the barricade had been removed by third parties earlier in the evening. This act of vandalism was reported to the police, and the perpetrators were arrested. Craig Gaspard, a city police officer, testified that he replaced the barricades after the boys who removed them had been booked. This occurred several hours prior to the accident. Gaspard also testified that, after the wrecker moved Stovall’s truck from the tracks, the barricade was under the truck. Additionally, Gaspard testified that he and a fellow officer, Farrell Gaspard, had passed the accident scene at approximately 11:00 P.M., several hours before the accident, and the barricades were in place. This testimony was corroborated by the deposition testimony of Farrell Gaspard, entered into evidence at trial. Finally, Berry, one of the passengers in the Stovall truck, testified that although he had not seen any barricade as they approached the track, after the truck fell in the hole between the tracks and stopped, he saw barricades on the other side of the track.
Stovall, Ceasar, and Bazile[2] all testified that they did not see any barricades at the railroad crossing. Despite the irreconcilable conflicts in the evidence, the trial court found that there was a barricade across the road and it was struck by the Stovall vehicle. We cannot say that this finding is clearly wrong and thus find Stovall’s assignment of error without merit.
ADEQUATE ADVANCE WARNING
The Railroad and the Town of Man-sura contend that the trial court erred in failing to find that Stovall’s conduct was the sole and proximate cause of the accident. Within this contention, both the Railroad and Town of Mansura contend that the trial court erred in finding that there was inadequate warning at the railroad crossing under construction. The Railroad also contends that there is no factual or legal basis to find it 10% at fault in failing to provide advance warning.
The trial court found that a single barricade crossed the road where the accident occurred. The barricade was equipped with flashing lights, although the evidence is scant as to whether the flashing lights were in working condition at the time of the accident.[3] The barricade had a “Road Closed” sign attached. There were no other advance warning signs.
The trial court found that these single barricades on either side of the railroad crossing were an inadequate warning to the public. “The necessity for prewarning devices is dependent upon the circumstances of each case.” Travelers Insurance Co. v. Ragan, 202 So.2d 302, 307 (La.App. 1 Cir.1967). The trial court correctly reviewed the jurisprudence involving the Department of Transportation and Development in determining the proper standard as to the duty to warn of hazardous conditions. This duty extends not only to prudent and attentive drivers, but also to those who are momentarily inattentive. See, Ledbetter v. State, Dept. of Transp. & Dev., 502 So.2d 1383 (La.1987). We do not find that the trial court was incorrect in apportioning fault in the amount of 10% each for the Railroad and the Town of Mansura in light of the fact that there was a total lack of advance warning of the dangerous situation lying ahead.
Insofar as we agree with the trial court’s finding that there was inadequate advance warning, we find no merit in the contention that Stovall’s negligence was the sole cause of the accident.
The Railroad also contends that the trial court had no basis for finding the Railroad conjointly liable with the Town of Mansura for failing to provide adequate *777 advance warning of the hazard at the railroad crossing.
The duty of the Railroad to maintain railroad crossings arises from La.R.S. 45:323 and goes hand-in-hand with the duty to warn of any ongoing maintenance projects. This statutory duty, in conjunction with the general duty of care imposed by La.C.C. art. 2315, burdens the Railroad with the general duty to protect drivers from hazards created pursuant to the duty to maintain railroad crossings. It would be inconceivable that'the Railroad could fulfill its statutory duty to maintain railroad crossings without the conjunctive duty to warn the public of hazards created by this same maintenance work.
Therefore, we find the trial court was correct in finding that the Railroad was burdened with the duty to adequately warn the public of hazards created by their maintenance projects.
COMPARATIVE FAULT OF PLAINTIFFS
The Town of Mansura, the Railroad, and Stovall contend that plaintiffs, Berry and Ceasar, were comparatively negligent or assumed the risk of their injuries when they knew or should have known of Sto-vall’s intoxicated condition and nevertheless, voluntarily rode with him.
Recently, in Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1125 (La.1988), the Louisiana Supreme Court concluded “that the assumption of risk defense no longer has a place in Louisiana tort law.” Therefore, we must decide whether Ceasar and Berry negligently disregarded a known risk by riding with an intoxicated driver, and if so, to what degree was this negligence a proximate cause of their injuries.
Alton McGee, a witness who lived near the scene of the accident, testified that when Stovall used his phone after the accident, Stovall spoke to both him and his wife, walked under his own power, and was not staggering. He did not feel that Sto-vall was under the influence of alcohol consumption.
Clarence Burke, a Mansura policeman, testified that Stovall smelled of alcohol at the time of the accident and, although Sto-vall was very excited, he did not remember Stovall’s speech being impaired.
Farrell Gaspard, another Mansura policeman present at the scene of the accident, testified that Stovall emitted a strong alcohol odor, had slurred speech, bloodsho(t eyes, and staggered at times. He also testified that the inside of Stovall’s truck smelled of alcohol although he did not look for empty bottles or cans.
Stovall testified that he was not with Ceasar and Bazile before he picked them up in Eunice late Friday evening to return to Mansura. Both ladies testified that he did not appear drunk and that his driving was not impaired. All agreed that Berry and Stovall had split one half-pint of gin at Merlin’s Lounge in Mansura. Still, no one acknowledged any reason to believe that Stovall was driving drunk. Berry’s testimony was consistent with the others in stating that he and Stovall had had the same amount to drink, one-half of a half-pint of gin each. This testimony was corroborated by Merlin Sampson, who saw Ceasar, Berry, Stovall, and Bazile shortly before the accident and testified that they did not appear to be intoxicated.
Upon his arrest, Stovall was tested for blood alcohol content, which resulted in a reading of 0.219. Dr. McCormick testified that Stovall was 270 pounds and 6'2" and would need 18.7 drinks or the equivalent of eight ounces of pure 100% alcohol to reach this blood alcohol level. It is clear that Stovall had more to drink than the testimony adduced, but it is not clear as to what effect the alcohol had on him prior to the accident.
Dr. McCormick testified that certain individuals can “fake” normal responses with a .219 blood alcohol level so well that a casual observer would think that they were sober. On the other hand, assuming Sto-vall was not an alcoholic, McCormick testified that a normal person should have detected some differences in behavior.
This case can be distinguished from Townley v. Manuel, 509 So.2d 515 (La.App. *778 3 Cir.1987), a similar case recently decided by this Court. In Townley, a third party observed Manuel and Townley together five to seven hours prior to the accident, at which time Manuel smelled of alcohol. Additionally, Manuel was observed driving at an excessive rate of speed, while the trial court in this case found that Stovall was not traveling at an excessive rate of speed. Considering the fact that Stovall did not appear intoxicated to several uninterested witnesses shortly before or immediately after the accident, we cannot say the trial court was clearly wrong in finding that Ceasar and Berry were not negligent in riding with Stovall. The evidence does not support the conclusion, by a preponderance, that Berry and Ceasar knew or should have known of Stovall’s intoxicated condition.
CEASAR’S INJURIES
The Town of Mansura, the Railroad, and Stovall contend that Ceasar did not prove that the accident occurring March 30, 1985, was the cause-in-fact of the subsequent injuries to her arm and jaw. We find that the trial court was correct in its holding that Ceasar proved, by a preponderance of the evidence, a sufficient connexity between the falls in which she injured her wrist and jaw and the head injury she sustained in the accident. We adopt the trial court’s reasons for judgment as to Ceasar’s injuries, as follows:
“The damages sustained by Evelina Ceasar are more difficult to evaluate. The undisputed injuries are mild strains of the neck and back. She testified that she bumped her head at the time of the accident and that this injury lead (sic) to more serious injuries. There were more serious injuries suffered when she ‘blacked out’ and fell on two different occasions, one fall causing a fractured arm and the other causing a fractured mandible, or in lay terms, a broken jaw. The plaintiff claims that she had never fainted before the vehicle accident and that the accident brought on a condition which caused the fainting. The defendants assert that the evidence fails to prove a connection between the fainting spells and the vehicle accident.
“This court has studied the medical evidence carefully on the issue of whether those events were related. Dr. Jose Garcia Oiler, a neurosurgeon, diagnosed Ms. Ceasar’s condition as post-traumatic epilepsy and based this diagnosis on a number of factors which are discussed at great length in his deposition. Defendants argue that the evidence fails to support that diagnosis but even if correct, that the trauma which caused the condition may have been other than the vehicle accident.
“Dr. William McBride, an internist, testified that he, personally, would not have diagnosed traumatic epilepsy based upon the evidence which was available to Dr. Oiler. However, he admitted that this was not his field of expertise and he would rely upon the diagnosis of a neurosurgeon.
“There is certainly grounds for disagreement as to whether the evidence supports a finding that the vehicle accident caused the fainting spells which in turn caused the broken arm and broken jaw. It is acknowledged that Dr. Oiler’s diagnosis necessarily depended upon the history recited to him by Ms. Ceasar. Although Ms. Ceasar’s testimony relating to the accident and to the activities of the vehicle occupants prior to the accident was questionable, there was no evidence to dispute her testimony on the issue of the fainting spells. While considering it a very close issue, the court accepts the testimony of Dr. Oiler and finds that it is more probable than not that the vehicle accident caused the fainting spells and consequently, the arm and jaw injuries. Accordingly, the damages to be awarded must be based upon the evidence relating to the neck and back sprain, the broken arm and the broken jaw.”
DAMAGES
A. EVELINA CEASAR
By answer to appeal, Evelina Cea-sar contends that the trial court’s award of *779 damages to her is inadequate insofar as she was not compensated for the possibility of a lifetime of epilepsy. The trial court found that all of Ceasar’s injuries had healed and none had left any permanent impairment. The court also properly noted that no fainting spells had occurred for more than a year prior to the trial. The evidence did not disclose whether post-traumatic epilepsy was a temporary or permanent condition. Therefore, due to the fact that Ceasar has not sustained any further falls or “blackouts” for more than a year prior to trial, and has suffered no permanent impairment from her prior injuries, we do not find that the trial court erred in refusing to make an award of damages for a lifetime of epilepsy.
B. VINCENT BERRY
Berry contends that the trial court erred in failing to award him damages for loss of earnings or earning capacity. The trial court correctly found that Berry had failed to prove that either of these elements was compensable based upon the facts in this case. As the trial court stated in its reasons for judgment:
“Berry failed to prove loss of earnings. The long periods of unemployment both prior to the accident and subsequent to his recovery from the accident, when considered with his confused and inconsistent testimony and also the lack of substantiation by other evidence, indicates that it is more probable than not that he would not have earned income during the time he was disabled even if he had suffered no disability.”
In addition, there is no evidence in the record that Berry has suffered any loss of earning capacity insofar as he recovered completely from his injuries within approximately three months. Berry had not been employed for approximately six months before the accident and he had not returned to work at the time of trial, more than two years after complete recovery from all of his injuries. We do not find that the trial court was clearly wrong in finding that he had failed to carry his burden of proving either loss of earning capacity or loss of earnings based upon the evidence presented. Although, as Berry contends, an unemployed person may, in certain cases, recover for the impairment of his earning capacity, we do not find that Berry’s unemployment, under these facts, was due to his injuries. See, Folse v. Fakouri, 371 So.2d 1120 (La.1979).
DECREE
Based upon the foregoing, the judgment of the trial court is affirmed. Costs of this appeal are to be divided equally among all the parties.
AFFIRMED.

. A motion for directed verdict was granted in favor of LaCour after the close of plaintiffs’ case. This dismissal has not been appealed.

. Bazile had returned to the accident scene after being dropped off at her house nearby.

. The barricades had been used on a state highway construction job the week before the accident. At this time, the flashing lights had been inspected. Conversely, at the time of trial, several lights were missing or broken, although they were last used for this railroad crossing construction job at Mansura.