755 So.2d 315 (1999)
Christopher COLE, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana through the DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, Defendant-Appellant.
No. 99-912.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1999.
*319 Robert C. McCall, Erin M. Alley, Lake Charles, for Christopher Cole, et al.
Richard Allen Bailey, Sylvia M. Fordice, Baton Rouge, for State, through DOTD, et al.
BEFORE: YELVERTON, THIBODEAUX, and SULLIVAN, Judges.
THIBODEAUX, Judge.
The State of Louisiana, through the Department of Transportation and Development (hereinafter "DOTD"), appeals a trial court's judgment which found the DOTD sixty percent at fault and assessed damages for a defective condition of a roadway shoulder. The vehicular accident killed Richard Baggett, the driver, and caused serious injuries to Christopher Cole and to Shane Rodriguez, his guest passengers.
Christopher Cole answers DOTD's appeal and entreats us to increase the amounts awarded to him for past lost wages and for loss of future earning capacity. For the following reasons, we amend to increase the loss of future earning capacity from $100,000 to $261,117.69. We affirm the judgment in all other respects.

I.

ISSUES
We shall consider:
1. whether the trial court erred in concluding roadway and shoulder defects created an unreasonable risk of harm which was a contributing cause of the August 27, 1994 accident;
2. whether the trial court erred in excluding evidence of Richard Baggett's blood alcohol level and impairment due to alcohol consumption at the time of the accident;

*320 3. whether the trial court erred in apportioning sixty percent fault to DOTD and forty percent to Richard Baggett;
4. whether the trial court erred in awarding Christopher Cole $900,000 in general damages;
5. whether the trial court erred in awarding $50,000 to each parent of Christopher Cole for loss of consortium;
6. whether the trial court erred in awarding $750,000 to Christopher Cole for future medical costs;
7. whether the trial court erred in not ordering $66,395.17 in medical expenses awarded to Christopher Cole to be paid with preference and priority to the Department of Health and Hospitals to satisfy a Medicaid lien;
8. whether the trial court erred in not requiring future medical expenses awarded to be paid into a reversionary trust pursuant to La.R.S. 13:5106(B)(3);
9. whether the trial court erred in awarding only $20,000 in past earning capacity and $100,000 in future lost wages to Christopher Cole.

II.

FACTS
On August 27, 1994, at approximately 1:00 a.m., Christopher Cole and Shane Rodriguez were injured in a single-vehicle accident which killed the van's driver, Richard Baggett. The accident occurred on La. Highway 26 near Oberlin, Louisiana in Allen Parish. The three friends were returning home after listening to a friend play music at a campground in Eunice, Louisiana. The 1988 GMC Safari van inadvertently went onto the shoulder of the roadway as Baggett entered a ninety degree curve. The van was maneuvered partially on the roadway of the curve and partially on the shoulder. As the van was about to be returned to the road, Baggett encountered a discontinuity on the shoulder and lost control of his vehicle. The van overturned. All of the van's occupants were ejected. Cole and Rodriguez were severely injured, and Baggett was killed.
On August 28, 1995, Christopher Cole and his parents, Valery and Iva Cole, filed suit against DOTD and State Farm Mutual Automobile Insurance Company, the Baggetts' insurer. Shane Rodriguez filed suit on the same day against DOTD to recover damages he suffered. Joseph Baggett and Cecilia Baggett Sonnier, the parents of Richard Baggett, filed suit for Richard's wrongful death and survival action and named DOTD as the defendant. The plaintiffs in these consolidated cases alleged DOTD was responsible for the defective condition of the roadway and the shoulder of La. Highway 26. The trial court held DOTD to be sixty percent at fault in causing the accident and held Richard Baggett to be forty percent at fault. To Christopher Cole, the trial court also awarded $900,000 in general damages, $750,000 for future medical expenses, $68,395.17 for past medical expenses, $20,000 for loss of past income, and $100,000 for loss of future earning capacity. The court also awarded $50,000 to each of Christopher Cole's parents for loss of consortium.
DOTD appealed the judgment of the trial court. Christopher Cole answered the appeal, seeking an increase in the amount of damages awarded to him for past lost income and loss of future earning capacity.

III.

LAW AND DISCUSSION

Standard of Review
An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The appellate court must determine not whether *321 the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one, after reviewing the record in its entirety. Mart v. Hill, 505 So.2d 1120 (La.1987); Stobart, 617 So.2d 880; Rosell, 549 So.2d 840. Even where the appellate court believes its inferences are more reasonable than the factfinder's, reasonable determinations of fact should not be disturbed on appeal. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

Liability of DOTD
DOTD contends the trial court erred in concluding the roadway and shoulder defects created an unreasonable risk of harm which was a contributing cause of the August 27, 1994 accident and injuries. It attempts to negate its responsibility for the accident by asserting the actual cause of the accident and injuries was the excessive driving speed of the driver, Richard Baggett. We disagree.
To hold DOTD liable, the plaintiff has the burden of proving that:
1. the defendant had custody of the property which caused plaintiff's damages;
2. the property was defective because of a condition that created an unreasonable risk of harm;
3. the defendant had actual or constructive knowledge of the defect and the risk and failed to take corrective measures within a reasonable time; and,
4. the defect was a cause-in-fact and legal cause of the plaintiffs injuries.
Odom v. State, Dep't of Transp. and Dev., 95-1605 (La.App. 3 Cir. 9/25/96); 688 So.2d 1082.
It is undisputed that DOTD had custody of La. Highway 26 where the 1988 GMC Safari van left the road on August 27, 1994. DOTD has a duty to maintain its highways and shoulders in a reasonably safe condition which does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La.R.S. 48:21 A; Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986); Campbell v. Dep't of Transp. & Dev., 94-1052 (La.1/17/95); 648 So.2d 898. DOTD has a duty to maintain the shoulders and the areas off the shoulders, within the right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway who are using the area in a reasonably prudent manner. Oster v. Dep't of Transp. & Dev., 582 So.2d 1285 (La.1991). DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, a motorist might find himself on, or partially on, the shoulder. Graves v. Page, 96-2201 (La.11/7/97); 703 So.2d 566. DOTD owes this duty not only to prudent and attentive drivers but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Ledbetter v. State Through La. Dep't of Transp. & Dev., 502 So.2d 1383 (La.1987). "Whether DOTD breached this duty, that is, whether the roadway and shoulders at the scene of the accident were in an unreasonably dangerous condition, will depend on the particular facts and circumstances of each case." Myers, 493 So.2d at 1172. An irregularity or an imperfection must constitute a dangerous condition that would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Deville v. State Farm Ins. Co., 617 So.2d 1255 (La.App. 3 Cir.1993). Based on our review of the record, we find the plaintiffs carried their burden of proving the defects in the slopes of the shoulder and the roadway created an unreasonable risk of harm which contributed to causing the injuries in this case.
The plaintiffs presented the testimony of Janardanan Uppot, a civil engineering professor at McNeese State University. Dr. Uppot was the only person to survey and to take measurements of the shoulder at the accident scene. He measured the slope of the paved surface and the slope of the shoulder at several points in the curve. *322 In his opinion, the paved surface sloped in the opposite direction of the slope of the shoulder. According to Dr. Uppot's measurements, the roadway and the shoulder were in compliance with the American Association of State Highway and Transportation Officials [AASHTO] standards at only one point in the curve.
Dr. Davy Bernard, an expert in accident physics and accident reconstruction, accepted Dr. Uppot's measurements. He testified the excessive slope at the accident scene caused the shoulder of La. Highway 26 to be non-recoverable. In other words, it would be extremely difficult for a vehicle to return to the roadway once it left the paved portion of the highway. Dr. Bernard concluded an abrupt elevation change in the area of a private driveway caused the Safari van to flip.
DOTD offered the testimony of Richard Robertson, a reconstruction expert who readily accepted Dr. Uppot's measurements of the accident scene. Dr. Robertson agreed with Dr. Bernard that the shoulder contained defects in the vicinity of the driveway; however, he concluded the van began flipping before it reached the defective shoulder. He also opined any grade break, or slope, would not have affected the vehicle because all the wheels of the Baggett van were off the highway during the majority of the accident.
It is uncontroverted that the grade break, or slope, was not in compliance with the accepted AASHTO safety standards in all but one area of the curve at the accident scene. Another defective area was where the shoulder met the private driveway which was in the vicinity of the accident. The trial court concluded that "it is more probable than not that these defects created an unreasonable risk of harm because they could cause non-recovery and flipping when the wheels of a vehicle leave the paved portion of a highway." We find the trial court was reasonable in its determination that the roadway and the shoulder were in a defective condition at the time of the accident, thus creating an unreasonable risk of harm.
DOTD had actual or constructive notice of the defect and failed to timely correct it. "While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to discover that which is easily discoverable." Brown v. Louisiana Indem. Co., 97-1344, p. 8 (La.3/4/98); 707 So.2d 1240, 1244.
Mr. Charles Sarver, the Allen Parish maintenance supervisor for DOTD, testified he drives the roads in Allen Parish that are under the control of DOTD biweekly looking for deficiencies on the roadway. La.R.S. 48:35 A authorizes DOTD to "adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance." The statute further authorizes that these standards "correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials." Mr. Sarver disclosed at trial neither he nor his crews ever measured the slope of the shoulder which was the scene of the accident to detect whether it was in compliance with applicable AASTO standards.
A similar accident had occurred in the same location many years prior to the August 27, 1994 tragedy.
The trial court was reasonable in finding DOTD had constructive notice of the slope defect and failed to utilize corrective measures within a reasonable time.
Drs. Bernard and Robertson arrived at different conclusions regarding the cause of the accident. Dr. Bernard attributed the excessive grade break as the cause of the accident because it created a non-recoverable shoulder which made it extremely difficult for the van to return to the roadway before it reached the driveway area. He also concluded the van became airborne and began to flip when it *323 was confronted with discontinuity in the shoulder in the locale of the driveway. Dr. Robertson believed the accident was strictly caused by Richard Baggett's excessive speed and his failure to notice and to heed warning signs. He disagreed with Dr. Bernard's theory of when the van became airborne. He testified the Safari van began to flip before it reached the driveway area and he opined that all the wheels of the van were off the roadway during the majority of the accident.
The experts' differences extended to the speed of the Safari van, as each used a different formula to calculate the speed at which Richard Baggett was traveling. Not surprisingly, each disputed the other's method of calculation. The plaintiffs expert, Dr. Bernard, accepted a launch angle and determined the van was traveling at thirty miles per hour at the time of the accident. Dr. Robertson utilized a coefficient of friction for gravel which established Baggett's speed at seventy-four miles per hour. The speed limit on the road was fifty-five miles per hour. The trial court reasonably concluded Richard Baggett was traveling between forty-five and fifty-five miles per hour when his van left the roadway.
We further accept as reasonable the trial court's judgment that the excessive grade break, or slope, was the defect which caused an unsafe condition which made it difficult for Richard Baggett to return the Safari van to the highway. It is more probable than not that an unexpected change in elevation or discontinuity in the area of the driveway caused the van to lose its position on the highway and begin flipping.
The evidence in support of this finding is overwhelming. State Police photographs taken shortly after the accident poignantly demonstrate the strength of the plaintiffs' cases and the reasonableness of the trial court's findings. They unquestionably confirm the left wheels of the van were on the highway during the majority of the time and that the grade break was responsible for pulling the van away from the highway. These photos also prove the right front tire of the Baggett van was close to returning to the highway when it began to flip.

Blood Alcohol Level of Richard Baggett
The defendant argues the trial court erred in excluding evidence of the blood alcohol level and impairment of Richard Baggett due to alcohol consumption at the time of the accident.
The trial court remarked:
DOTD attempted to prove that the accident resulted in part from Richard Baggett being under the influence of alcohol. A state trooper who investigated the accident testified that there were beer bottles and [sic] the scene as well as an odor of alcohol. DOTD attempted to introduce Mr. Baggett's blood analysis at trial, but it was not allowed into evidence due to defects in the chain of custody of the blood sample. Although there was evidence that the young men had consumed alcoholic beverages at some point during the evening, DOTD failed to prove by legal evidence that the driver, Richard Baggett, was under the influence of alcohol at the time of the accident.
We find that DOTD is incorrect in its assessment that the trial court was convinced Richard Baggett suffered some impairment due to his alcohol consumption. The trial judge refused to allow the evidence of Baggett's alcohol level and impairment because a proper foundation was not laid regarding the results of the blood analysis test and the chain of custody of the blood sample. Before blood alcohol analysis results can be admitted in a civil or a criminal proceeding, the party seeking to introduce the results must lay a proper foundation by connecting the specimen with the source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person and properly tested. *324 Baughman v. State, Dep't of Transp. and Dev., 28,369 (La.App. 2 Cir. 5/8/96); 674 So.2d 1063, writ denied, 96-1882 (La.11/1/96); 681 So.2d 1260. Absent the medical records exception, proponents of a blood alcohol test result are required to lay a proper foundation, which foundation relates not only to the chain of custody, but also to the integrity and reliability of the chemical test. Judd v. State, Dep't of Transp. and Dev., 95-1052 (La.11/27/95); 663 So.2d 690.
"The purpose of the chain of custody rule is to assure the integrity of the evidence...." Bufkin v. Mid American Indem. Co., 528 So.2d 589, 592 (La. App. 2 Cir.1988). If the reliability of a sample, combined with the chain of custody as a whole, render the sample unreliable, it must be excluded from evidence.
DOTD presented Trooper Roger L. Thomas, the officer who arrived at the scene around 2:07 a.m., approximately sixty-seven minutes after the accident occurred. He testified he smelled alcohol and saw several beer cans inside the van and in the ditch area. The Allen Parish Coroner pronounced Richard Baggett dead at 2:20 a.m. Trooper Thomas contacted Ardoin Funeral Home in Kinder, Louisiana to transport the body of Richard Baggett and he followed the body to the funeral home. He then notified Mr. Frederick Oliver, who was identified by Trooper Thomas as a medical technician, to draw blood from Richard for a blood alcohol analysis. Trooper Thomas testified he gave Mr. Oliver a post-mortem kit and Mr. Oliver drew two vials of blood. The postmortem kit contains a long needle which is used to take a sample from a decedent's heart, unlike a regular blood kit which contains a short needle which is used to take blood from a person's arm if that person is still alive. Trooper Thomas testified in his deposition the sample taken from Richard Baggett was from his arm. At trial, however, the trooper testified he did not remember exactly from which body part Richard Baggett's blood had been drawn. Trooper Thomas declared he sealed the blood kit, transported it to State Police headquarters in Lake Charles and placed the kit in the evidence locker.
Mr. Frederick Oliver was not present at trial. The absence of his testimony and Trooper Thomas' inability to recall precisely where the sample was taken rendered the blood sample unreliable and inadmissible.

Apportionment of Fault
DOTD claims the trial court erred in allocating sixty percent of the fault to DOTD and only forty percent to Richard Baggett. We must give great deference to the trial court's apportionment of fault. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607. "We must consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." Brown, 707 So.2d at 1245, citing Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). This is the standard appellate courts are compelled to utilize when allocating fault to the parties.
DOTD concluded that although the blood alcohol analysis evidence was not admitted, "the trial judge opined Richard Baggett had a duty to use reasonable care in the operation and control of his vehicle, and breached his duty ... when he allowed his tires, through excessive speed, inattentiveness, alcohol impairment, or simple inadvertence, to leave the roadway." One must consider whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm. LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978). This is the substantial factor test which was developed in Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 481, 137 So.2d 298, 302 (1962) where the court concluded "negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing *325 about that harm...[t]he negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it."
DOTD aggressively argues Richard Baggett's conduct was the cause of the accident. The defendant's conduct was a cause-in-fact of the harm if it was a "substantial factor" in bringing about the harm. Graves, 703 So.2d 566. We held in Rochelle v. State, Through DOTD, 570 So.2d 13, 18 (La.App. 3 Cir.1990), writ denied, 572 So.2d 93 (La.1991), quoting McDaniel v. State, Dep't of Transp., 398 So.2d 88 (La.App. 3 Cir.1981), writ denied, 404 So.2d 277 (La.1981):
A motorist owes the duty of reasonable care which includes the additional duties of keeping his vehicle under control....
The defendant implores this court to apply the Louisiana Supreme Court's holding in Netecke v. State, Through DOTD, 98-1182 (La.10/19/99); 747 So.2d 489. In that case, the plaintiff was severely injured in a two-vehicle, head-on collision where the court found the accident was caused solely by the other motorist's negligent operation of her vehicle. The supreme court reversed the court of appeal's judgment which had apportioned fifty percent fault to Ms. Zebouni, a defendant, and fifty percent to DOTD. It assigned one hundred percent fault to Ms. Zebouni. Ms. Zebouni claimed in order to avoid hitting a cat, she intentionally steered her car onto the shoulder. She traveled parallel to the highway with her right tires in a grassy area adjacent to the shoulder for sixty-five feet. She subsequently oversteered her vehicle and reentered the paved shoulder at a sharp angle. Her vehicle returned to the travel lane, crossed over the center line and collided into the plaintiffs vehicle. During her deposition and trial testimonies, Ms. Zebouni, for the first time, testified she saw a brown embankment coming parallel to her windshield while she was driving in the grassy area. This embankment contributed to her oversteering to the left and subsequently colliding with Ms. Netecke, the plaintiff. Evidence later revealed that what Ms. Zebouni perceived to be an embankment was actually a brown grassy area around a culvert that DOTD had sprayed with herbicide. The court accepted DOTD's expert civil engineer's testimony that Ms. Zebouni reacted to leaving the roadway, oversteered and collided with Ms. Netecke. The court found "the culvert and the brown grassy area at issue in this case support a social utility that outweighed any perceived risk of harm by Ms. Zebouni." Id. at 16.
We decline to follow DOTD's suggestion that Netecke requires us to reverse the trial court's apportionment of fault. Had Ms. Zebouni remained in the grassy area and had she not made an attempt to reenter the highway, especially at such an excessive speed, she would not have lost control of her vehicle. In this case, however, Richard Baggett was found to have been traveling forty-five to fifty-five miles per hour, a speed which was in accordance with the posted speed limit of fifty-five miles per hour. His attempt to reenter the highway was done in a safe and reasonable manner; however, facts and photographs show it was a grade break, or slope, which prevented Richard from reentering the paved roadway, not his own conduct. Thus, we maintain the trial court's allocation of the percentages of fault.
Richard Baggett had a duty to use reasonable care in the operation and control of his van and his inattentiveness, simple inadvertence or alcohol impairment, if any, was a breach of that duty. The scope of this duty included the risk that guest passengers might be injured in an accident. Molbert v. Toepfer, 550 So.2d 183 (La.1989). Richard's negligence was a substantial factor in causing the accident and injuries. However, DOTD had a duty to appropriately construct and maintain the roadway and shoulder of the curve on La. Highway 26. Based on the excessive grade break and the abrupt change in elevation of the curve, coupled with *326 DOTD's non-compliance with AASHTO standards, we find DOTD definitely breached its duty and was also a substantial factor in causing the Safari van to flip and eject its passengers. Therefore, the negligence of both Richard Baggett and DOTD caused the injuries of Christopher Cole and Shane Rodriguez and caused the death of Richard Baggett.
We agree with the trial court that it cannot conclusively be determined that the accident would not have happened had the shoulders been properly maintained, but we, like the trial court, are convinced that the damages incurred would have been less had the shoulders on La. Highway 26 been better maintained. We, therefore, affirm the trial court's allocation of sixty percent of fault to DOTD and forty percent to Richard Baggett.

General Damages to Christopher Cole
An award of general damages by a trial court is entitled to great deference and should not be disturbed by a reviewing court absent a showing of a clear abuse of that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Reck v. Stevens, 373 So.2d 498 (La.1979). The initial inquiry must address the individual circumstances of each case. Id. The standard for appellate review for general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Garza v. Fontenot, 97-125 (La.App. 3 Cir. 6/4/97); 696 So.2d 194.
The trial judge awarded $900,000 in general damages to Christopher Cole. Christopher suffered a serious closed head trauma as a result of this accident. He was in a coma for six days and underwent mental and physical rehabilitation because of his injuries. He suffers a crippling left arm injury and double vision. He has memory difficulties and is incapable of taking care of his business affairs. Christopher also has problems controlling his emotions, and he continues to need treatment and rehabilitation for these problems which were caused by the accident.
The record fully supports the award. The deposition of Dr. Nguyen Nguyen, a psychiatrist, concluded that Christopher suffers a severe memory impairment. His recent memory is poor and his remote memory is fair. His condition is characterized as unpredictable. Dr. Paul Steinkuller, an ophthalmologist, performed surgery on Christopher on December 14, 1995 to correct his binocular vertical diplopia, or double vision. The double vision was not completely corrected; he still has double vision when he has to look to his left and to his right. Dr. Steinkuller concluded Christopher will not improve anymore. He also determined Christopher could lose the ability to control the alignment of his eyes and his double vision may become more symptomatic. There is a possibility that Christopher will have to have additional surgery. A psychiatric evaluation completed by Dr. Sam H. Benbow on October 9, 1997 reveals Christopher has cognitive deficits, especially in the area of memory. His prognosis was quite poor. Dr. Benbow advised that if Christopher entered a rehabilitation program, "he may improve enough to do some low level type of work activity and care for himself but this would require some extensive closed head injury rehabilitation."
Based upon our review of the record, we refuse to disturb the general damage award of $900,000.

Loss of Consortium Award
DOTD appeals the trial court's judgment to award each of Christopher's parents $50,000 for loss of consortium.
In order to establish a claim for loss of consortium, a claimant must factually support the defendant's liability, the damage suffered by the primary victim, and his or her loss of consortium *327 damages. Peck v. Wal-Mart Stores, Inc., 96-645 (La.App. 3 Cir. 11/6/96); 682 So.2d 974.
Valery and Iva Cole underwent a tremendous amount of stress and uncertainty after being informed of their son's accident. When Christopher was transferred from Oakdale Hospital to LSU Medical Center in Shreveport by helicopter, they followed him there by car and slept in the waiting room for the first two nights. Christopher was unrecognizable when the Coles first saw him in the trauma unit. Mrs. Iva Cole testified they passed Christopher's bed because "he didn't look anything like himself." Because Christopher was in a coma, the Coles were allowed only two visits per day.
Christopher was sent to Summit Rehabilitation Hospital in Sulphur, Louisiana and stayed there approximately one week. Valery and Iva Cole visited him everyday, but they had to remove him because, on several visits, they found Christopher lying in bed wet from urinating on himself and no staff member was changing his bed sheets. When Christopher was taken from Summit, he was unable to bathe, feed, dress, or walk without the assistance of his parents. The Coles had to potty train him again. When Christopher began having outbursts of anger, the Coles decided to send him back to Summit for treatment.
Once Christopher was released from Summit, his outbursts continued and began affecting the entire Cole family. On one occasion, Christopher struck his mother in the face. He also verbally attacked his younger sister. To make life easier for the family, Christopher moved into a trailer next door to the family home. His parents continued to care for him.
Whether a person is entitled to loss of consortium damages is a question of fact which cannot be reversed on appeal absent manifest error. Mathews v. Dousay, 96-858 (La.App. 3 Cir. 1/15/97); 689 So.2d 503. There was uncontroverted testimony that the Cole family significantly changed in the months following Christopher's accident. The accident had a negative effect on the Coles' relationship with their son. Although Valery and Iva Cole had to provide for Christopher's needs just as they did when he was a young lad, the bond between them became severely strained because of Christopher's damaged emotional state. Based on these facts, we do not find the trial court was manifestly erroneous in awarding Valery and Iva Cole $50,000, each, for loss of consortium.

Future Medical Expenses
DOTD contends the evidence was speculative as to the cost for Christopher's treatment and rehabilitation; thus, DOTD seeks to have this court reduce the award of $750,000.
"Future medical expenses are a legitimate form of recovery, even though they are not susceptible of precise mathematical calculations. However, awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost." Holliday v. United Services Auto. Ass'n, 569 So.2d 143, 146 (La.App. 1 Cir.1990), citing Weston v. Bayou Sale Contractors, Inc., 506 So.2d 818 (La.App. 1 Cir.1987). "However, when the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award." Id., citing Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281 (La.1984); Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
Jeffery J. Peterson, a vocational rehabilitation expert, evaluated Christopher in April, 1998. He concluded that Christopher currently had no vocational potential and it was probable that he would remain totally vocationally disabled. Mr. Peterson determined that if Christopher underwent extensive closed head injury rehabilitation, his vocational potential might increase from poor to fair; however, Christopher's vocational alternatives *328 would continue to be severely limited. Two rehabilitation options were recommended by Mr. Peterson. Because Christopher continues to suffer depression, mood swings, short-term memory loss, lack of concentration, lack of self-esteem, and because he has difficulty making decisions, he will need ongoing medical treatment. Christopher could either enter a comprehensive head injury center for a limited period of time and then return to society with some vocational assistance on an ongoing basis or he could enter a comprehensive facility with residential placement thereafter. In his evaluation, Mr. Peterson concluded Christopher stood "a better chance for life long adaptation to his brain injury with Option II [residential placement] services."
The lifetime anticipated costs for Christopher in 1998 dollars based on 49.7 additional years of life is:

Option I total ..........$ 51,426.95
Option II total .........$1,607,198.50

Under Option II, Christopher would have no wage earning potential and would therefore be totally and permanently vocationally disabled. Dr. Kenneth Glenn McCoin, the plaintiffs' economist who was tendered as an expert, arrived at a present day value for Option I of $418,859 and for Option II, a value of $1,484.403. With the existence of these medical cost projections by Mr. Jeffery Peterson and by Dr. Kenneth McCoin, we conclude the award of $750,000 for future medical expenses is reasonable and substantiated by the record.

Payment of Past Medical Expenses to the Department of Health and Hospitals
DOTD defendant avers the trial court erred in awarding medical expenses of $68,397.17 to Christopher and in not ordering the sum of $66,395.17[1] paid with preference and priority to satisfy a Medicaid lien. We find no merit in this argument.
DOTD argues La.R.S. 46:446 has granted the Department of Health and Hospitals a privilege for payments made on behalf of a claimant. Louisiana Revised Statutes 46:446 reads, in pertinent part:
A. When an injury has been sustained or an illness or death incurred by any person under circumstances creating in some third person or legal entity a legal liability or obligation to pay damages or compensation to that person or to his spouse, representative, or dependent, the Department of Health and Hospitals shall have a cause of action against such third party and/or may intervene in a suit filed by or on behalf of the injured, ill, or deceased person or his spouse, ... against such third party to recover the ... medical expenses the Department of Health and Hospitals has paid or is obligated to pay on behalf of the injured, ....
(Emphasis added).
The Department of Health and Hospitals had the opportunity to intervene in this suit but it did not do so. We find the trial court was not compelled to award damages to the Department of Health and Hospitals which chose not to be a litigant in this lawsuit.

Payment of Future Medical Expenses to a Reversionary Trust
DOTD asserts the trial court was incorrect in not awarding damages for future medical costs to be paid in accordance with the reversionary trust law under La. R.S. 13:5106 B(3).
Louisiana Revised Statutes 13:5106 was amended in 1996 and provides that an award of future medical expenses is to be paid into a reversionary trust. The amendment was made two years after the accident in which Christopher was injured. We have held that La.R.S. 13:5106 affected substantive rights and could not be applied retroactively. Lemaire v. Estate of Robert *329 L. Harrington, Jr., 97-256 (La.App. 3 Cir. 10/8/97); 701 So.2d 484, writ denied, 98-11 (La.2/20/98); 709 So.2d 785; Cormier v. T.H.E. Ins. Co., 97-1143 (La.App. 3 Cir. 5/27/98); 716 So.2d 387, rev'd on other grounds, 98-2208 (La.9/8/99); 745 So.2d 1. Therefore, we reject DOTD's contention.

Christopher Cole's Assignment of Error
Christopher contends the trial court erred in awarding only $20,000 in past lost wages and $100,000 in loss of future earning capacity. We find the award for loss of future earning capacity abusively low.
Only two economists testified, Dr. Kenneth McCoin for the plaintiff and Dr. Jay Stuart Wood for the defendant. Discounted to the date of trial, Dr. Wood's calculation of future lost earning capacity was between $30,994.85 and $44,341.34 (the difference being whether the growth rate factor of Christopher's annual earnings used was two percent or five percent). Dr. McCoin's calculation was $1,026,534.00. Obviously, the trial judge thought Wood's estimate was too low and McCoin's too high, because the trial judge awarded $100,000.00 for loss of future earning capacity. Although the testimony of these two experts did not go into too much detail, their detailed reports were introduced into evidence. From these reports we can compare their respective analyses.
Both used similar work-life expectancies for this nineteen-year-old youth. McCoin calculated 37.24 years (from date of injury) and Wood calculated 32.06 years (from date of trial).
There are three principal differences in their calculations. The first is their estimates of Christopher's future annual income had he not been injured. Wood's assumption was $5,089.74 a year for the rest of his life. McCoin's estimate, on the other hand, was based upon a study by the U.S. Department of Commerce, Economics and Statistics Administration, Bureau of Census, which showed expected earnings of $22,668.00 in 1998, the year of trial, for a person with Christopher's qualifications. The second difference in their calculations was fringe benefits: Wood said there would be none and McCoin figured fringe benefits at 24.3% of Christopher's annual salary. The third was the rate of interest used to discount the loss to its present day (1998) value. Wood applied a 5.7% rate while McCoin applied a 1.4% rate.
Because the trial court generally accepted the testimony of Wood over McCoin, we cannot say that his adoption of Wood's opinion concerning fringe benefits and the discount rate of interest was error. However, we believe that the trial judge mistakenly construed the testimony of Wood when he made the award of $100,000.00. We reach these conclusions based on the following analysis.
Wood's lowest estimate of this loss was a range from $30,994.85 up to $44,341.34. This was based upon the assumption that Christopher's expected average future earning capacity pre-injury was only $5,089.74 annually, and that his post-injury income would be about eighty percent of that. Commenting on those estimates at trial, Dr. McCoin stated that such an earning capacity over one's entire lifetime "strikes me as incredibly low for a human being. It's far below the minimum wage." We, too, find that Wood's lowest estimate was unreasonably low. While the trial judge gave no explanation for how his award of $100,000.00 was calculated, it is clear that the trial judge also believed that Wood's lowest estimate was too low. Had the trial judge examined Wood's report in evidence, he would have discovered that Wood actually prepared another estimate which recognized the Bureau of Census study and provided alternative calculations of the present value of Christopher's future loss. Wood's alternative calculation was $261,117.69. We regard this as the most reasonable amount that the trial judge could have awarded for loss of future earnings, and will amend the judgment accordingly.
*330 On the other hand, we will leave the trial court's award of loss of past earnings at $20,000.00 untouched. Although that sum is facially inconsistent with Bureau of Census estimates for Christopher's qualifications in the four-year period from the injury to the trial, it has enough statistical support based upon his immediate prior earnings for us to find no abuse of discretion.

DOTD's Liability
After the forty percent reduction of fault allocated to Richard Baggett, we find DOTD liable to Christopher Cole and his parents, Valery and Iva, as follows:

Christopher Cole.......$1,198,507.72
Valery Cole ...........$ 30,000.00
Iva Cole ..............$ 30,000.00

IV.

CONCLUSION
Based on the foregoing reasons, the judgment of the trial court is amended in part and, as amended, affirmed. We amend and increase the award for loss of future earning capacity from $100,000 to $261,117.69.
Interest on all amounts shall run from the date of judicial demand.[2]
All costs in the amount of $11,865.10 are assessed to the State of Louisiana, Through the Department of Transportation & Development.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] All parties agreed that $66,395.17 was the correct amount of past medical expenses.
[2] DOTD initially assigned as error the trial court award of prejudgment interest on future medical costs and loss of future earning capacity. It abandoned its position at oral argument and conceded the correctness of this award.